UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| CELLULOSE MATERIAL SOLUTIONS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> SC MARKETING GROUP, INC., <br><br> Defendant. | Case No. 22-cv-03141-LB <br><br> **CLAIM-CONSTRUCTION ORDER** <br><br> Re: ECF Nos. 32, 47, 49, 50 |

**INTRODUCTION**

Plaintiff Cellulose Material Solutions claims that defendant SC Marketing Group infringes a patent for packaging insulation that keeps the package contents — for example, meal kits with food items — cool and fresh without the need for refrigerant packs. The patent is U.S. Patent No. 11,078,007 (the '007 patent). The parties are competitors.[1] Cellulose's insulation product is called InfinityCore, and SC Marketing's product is called Renewliner.[2]

The court construes the disputed terms as follows:[3]

---

[1] Compl. – ECF No. 1 at 1–2 (¶ 1), 4 (¶ 16), 6 (¶ 30); U.S. Patent No. 11,078,007 (filed June 27, 2016) – ECF No. 1-1. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents and sometimes also to the page numbers at the bottom of documents.

[2] Compl. – ECF No. 1 at 2 (¶ 2), 3 (¶ 15). The complaint capitalizes the names.

[3] Joint Claim-Constr. Statement – ECF No. 32-2 (parties' proposals and support for the proposals).

ORDER – No. 22-cv-03141-LB

| Claim Term | Construction |
|---|---|
| "uniform thickness" | plain and ordinary meaning |
| "resiliently compressible" "resiliently expand" | "returns to the original form after being compressed" |
| "fibrous batt comprised primarily" | "a batt comprised primarily of [thermoplastic or PET] fibers" |
| "folded without the need for creases, grooves, or cut lines" "foldable" | plain and ordinary meaning |
| "air laid thermoplastic fibrous batt" | "A batt comprising thermoplastic fibers, where the batt is formed using airlaying" |

## STATEMENT

The '007 patent relates to an improved insulation product that protects perishable products during shipment.[4] Prior insulation products were semi-rigid expanded styrene panels or polymer or paper bags stuffed with cotton.[5] The '007 patent describes an insulation system comprised of a batt (a core) made of thermoplastic fibers with thermoplastic film adhered to the batt's sides (like a sandwich). The insulation can be shipped flat and compressed. It expands when it is unpacked and can be folded "readily" to match the inside of a packing box.[6]

The claims at issue are independent claims 1, 20, and 23.

Claim 1 of the patent recites the following:

    1. A method for insulating packaging containers comprising: providing a flat laminated packaging insulation which is of uniform thickness, resiliently compressible and foldable, cut to size for locating in a packaging container, said packaging insulation comprising an air laid thermoplastic fibrous batt comprised primarily of thermoplastic fibers, said batt being of uniform thickness, resiliently compressible and foldable, and having foldable thermoplastic film material adhered to both sides of said batt to form a laminate which can be folded without the need for creases, grooves[,] or cut lines in said laminate to facilitate folding, whereby said laminated packaging insulation can be manufactured, compressed[,] and

---

[4] '007 Patent – ECF No. 1-1 at 2 (at [57]), 10 (col. 1 ll. 23–34).

[5] *Id.* at 10 (col. 1 ll. 16–19).

[6] *Id.* (col. 1 ll. 23–31).

shipped as a flat panel of uniform thickness, and allowed to resiliently expand and be folded for insertion into a packing container.[7]

Claim 20 recites the following:

> 20. A package insulation material comprising: a flat laminated packaging insulation which is of uniform thickness, resiliently compressible and foldable, cut to size for locating in a packaging container, said packaging insulation comprising a thermoplastic fibrous batt comprised primarily of thermoplastic fibers, said batt being of uniform thickness, resiliently compressible and foldable, and having foldable thermoplastic film material adhered to both sides of said batt to form a laminate which can be folded without the need for creases, grooves[,] or cut lines in said laminate to facilitate folding, whereby said laminated packaging insulation can be manufactured, compressed[,] and shipped as a flat panel, and allowed to resiliently expand and be folded for insertion into a packing container.[8]

Claim 23 recites the following:

> 23. A product shipping combination comprising: a packaging container; a flat laminated packaging insulation which is of uniform thickness, resiliently[] compressible and foldable, being cut to size for folding and locating in said packaging container, said packaging insulation comprising an air laid PET [polyethylene] fibrous batt comprised primarily of PET fibers, said batt being of uniform thickness, resiliently compressible and foldable, and having foldable PET film material adhered to both sides of said batt to form a laminate which can be folded without the need for creases, grooves[,] or cut lines in said laminate to facilitate folding, whereby said laminated packaging insulation can be manufactured, compressed[,] and shipped as a flat panel, allowed to resiliently expand and be folded for insertion into said packing container; said laminated packaging insulation being folded and inserted into said packaging container.[9]

The court held a claim-construction hearing on May 25, 2023. All parties consented to magistrate-judge jurisdiction.[10]

## GOVERNING LAW

Generally, claim terms are given their ordinary and customary meaning from the perspective of a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). A person of ordinary skill in the art is "deemed to read

---

[7] *Id.* at 11 (col. 4 ll. 19–33).

[8] *Id.* at 12 (col. 5 ll. 30–43).

[9] *Id.* (col. 6 ll. 19–34).

[10] Consents – ECF Nos. 11 & 15.

ORDER – No. 22-cv-03141-LB        3

the claim term not only in the context of the particular claim in which the disputed term appears, but [also] in the context of the entire patent, including the specification." *Id.* at 1313.

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In other cases, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Id.* That is because (1) the meaning of a claim term, as understood by a person of skill in the art, is not often apparent and (2) patentees frequently use terms idiosyncratically. *Id.* In these cases, courts look to sources available to the public to show what a person of skill would have understood the disputed term to mean. *Id.* The sources include the words of the claim, the specification, the prosecution history, and "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.*

Claim construction may differ from the ordinary and customary meaning of a term only "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). To act as an "own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." *Id.* (cleaned up); *Phillips*, 415 F.3d at 1316 (the specification may reveal a special definition for a term, in which case, the inventor's lexicography governs). "The standard for disavowal of claim scope is similarly exacting:" it must be a "clear disavowal of [the] claim scope." *Thorner*, 669 F.3d at 1366; *Phillips*, 415 F.3d at 1316 (the specification may show the inventor's "intentional disclaimer, or disavowal, of claim scope").

The claims "provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. But as discussed above, the claims do not stand alone: they are part of a "fully integrated written instrument consisting principally of a specification that concludes with the claims," and for that reason, the claims "must be read in view of the specification, of which they are a part." *Id.* at 1315 (cleaned up). The specification "is always highly relevant" to the

claim-construction analysis. *Id.* "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*

Nonetheless, a court must "avoid the danger of reading limitations from the specification into the claim." *Id.* at 1323. Thus, for example, if a specification "describes only a single embodiment" of a claimed invention, that does not mean that the court must construe the claims as limited to that embodiment. *Id.* Rather, "[t]o avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." *Id.* The best way to do that often is to provide one or more examples. *Id.*

A person of ordinary skill in the art also looks at the prosecution history of a patent to understand how the patent applicant and the Patent Office understood the claim terms. *Id.* at 1313, 1317. The prosecution history lacks the clarity of the specification and thus is less useful for claim construction. But it can "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317; *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017) (patent owner's statements in an IPR proceeding can support a finding of prosecution disclaimer during claim construction).

Courts also have the discretion to consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, if necessary or helpful to construe the true meaning of claim terms, so long as the evidence is not used to "vary[] or contradict[] the terms of the claims." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980–81 (Fed. Cir. 1995). The evidence "may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." *Id.* at 980; *Phillips*, 415 F.3d at 1312–17. But this evidence is "less significant than the intrinsic record [the claims, specification, and prosecution history] in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317. The intrinsic evidence "is a more reliable guide to the meaning of a claim term than are extrinsic sources like technical dictionaries, treatises, and expert testimony." *Chamberlain Grp., Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008) (citing *Phillips*, 415

F.3d at 1318–19). A court must be careful not to elevate extrinsic sources of evidence "to such prominence . . . that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Phillips*, 415 F.3d at 1321.

The "correct construction" is the one that "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Id.* at 1316.

## ANALYSIS

1. **Claim Term: "Uniform Thickness" (Claims 1, 20, 23)**

The parties' proposed constructions are as follows:

| Claim Term: "Uniform Thickness" (Claims 1, 20, 23) ||
|---|---|
| **Cellulose** | **SC Marketing** |
| "A thickness that is not altered by predefined creases, grooves, cut lines[,] or the like to facilitate folding." | Indefinite<br><br>Alternatively:<br><br>"The thickness of the packaging insulation remains the same in all cases and at all times."[11] |

The term is in the claims but is not in the specification. Cellulose amended the claims voluntarily to add the term to distinguish its packaging from the McKinnon prior art, which was foldable because it was scored with grooves or creases.[12] Put another way, thickness in the Cellulose packaging is defined by the absence of the McKinnon characteristics.

More specifically, after the USPTO referenced the McKinnon prior art during the patent prosecution, Cellulose explained the meaning of the uniform-thickness limitation:

> McKinnon's laminate is foldable only because the laminated panel is separated into segments by a plurality of grooves or creases, which act as hinges. . . . In contrast to McKinnon, Applicant's "flat laminated packaging insulation" . . . is flat and of uniform thickness and thus has no creases or folds to facilitate folding.[13]

---

[11] Joint Claim-Constr. Statement – ECF No. 32-2 at 2 (p. 1).

[12] *Id.* (citing Cellulose's responses to the USPTO).

[13] 10/10/19 Resp., Ex. E to Mitchell Decl. – ECF No. 47-6 at 243 (p. 242).

Cellulose made its voluntary amendment to the claims, adding a further limitation of cut lines, and again explaining the uniform-thickness term:

> This response is a clarifying supplement to the response filed October 10, 2019. Claims 1, 21, and 24 have been amended for clarification and to amend the phrase "without creases or grooves" to state "without creases, grooves or cut lines." McKinnon uses all three words to describe the features which make his laminate foldable, and which also prevent it from being flat and of uniform thickness.[14]

Cellulose contends that (1) it offered "uniform thickness" only to distinguish its product from the McKinnon prior art's creases, grooves, and cut lines, and (2) SC Marketing's proposed "thickness is the same in all cases and at all times" is not justified by the record and is contradicted by the understanding of those skilled in the art of non-woven material that the thickness of the material is necessarily subject to some degree of variation.[15] SC Marketing counters that the term is indefinite because (in part) the specification provides no guidance. Also, it asserts, Cellulose's proposed construction reads out the term "uniform" (contrary to the requirement that the court give meaning to all terms in a claim), Cellulose elsewhere argued that the language is temporally limited only to the period before folding, and the claim already recites the limitation that the laminate can be folded "without the need for creases, grooves or cut lines."[16]

SC Marketing is right: Cellulose's proposed construction essentially eliminates the term uniform and reiterates the limitation later in the claims that the laminate can be folded without the need for creases, grooves, or lines. But SC Marketing's proposed construction is not supported by the record, which shows some necessary variability. Neither parties' construction is workable. The court gives the term its plain and ordinary meaning. It is not indefinite, given the limitation later in the claim that the laminate can be folded without the need for creases, lines, or grooves: that limitation "inform[s] those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

---

[14] 11/6/19 Resp., Ex. E to Mitchell Decl. – ECF No. 47-6 at 163 (p. 162).

[15] Pl.'s Corrected Opening Claim-Constr. Br. – ECF No. 47 at 15–16 (quoting Osswald Expert Report, Ex. H to Mitchell Decl. – ECF No. 47-9 at 13–14 (pp. 12–13) (¶ 43)).

[16] Def.'s Responsive Cl. Constr. Br. – ECF No. 49 at 10–12 (case citations omitted) (citing '007 Patent – ECF No. 1-1 at 11 (col. 4 ll. 19–33), 12 (col. 5 ll. 30–43, col. 6 ll. 19–34)).

2. Claim Terms: "Resiliently Compressible" and "Resiliently Expand" (Claims 1, 20, 23)

The parties' proposed constructions are as follows:

| Claim Terms: "Resiliently Compressible" and "Resiliently Expandable" (Claim 1, 20, 23) ||
|---|---|
| **Cellulose** | **SC Marketing** |
| "Resiliently Compressible"<br><br>"Capable of being compressed but expanding from the compressed state once the compressing force is removed; i.e., not permanently compressed by the compressing force" | "Resiliently Compressible"<br><br>Indefinite<br><br>Alternatively:<br><br>"Returns to the original form after being compressed and/or folded without any lasting deformation" |
| "Resiliently Expand"<br><br>"Naturally expanding from a compressed state once a compressing force is removed" | "Resiliently Expand"<br><br>Indefinite<br><br>Alternatively:<br><br>"Returns to the original form after being compressed and/or folded and lacks any lasting deformation"[17] |

The abstract describes the product: "packaging insulation which can be shipped flat and compressed, which expands when unpacked and which can be readily folded to match the interior configuration of a shipping container, such as a cardboard box."[18] The specification adds the following:

> Surprisingly, the laminated PET [polyethylene] product can be compressed to a greater degree than other types of fibrous batts used in packaging insulation, making it more economical to ship to the customer. When the laminated PET batts are unpacked at the customer's location, they expand back to at least near their original thickness, and can be folded to fit the packaging container in which product is to be shipped.[19]

Cellulose's expert explains that

> A [person of ordinary skill in the art] would understand that the non-woven laminates are manufactured of polymeric materials which have viscoelastic mechanical properties. . . . This results in a laminate that is viscoelastic, which springs back to nearly its original thickness. A [person of ordinary skill in the art] would understand that because of the viscoelastic mechanical behavior of polymers, the original thickness is not recovered, or is recovered after some time

---

[17] Joint Claim-Constr. Statement – ECF No. 37-2 at 5 (p. 4), 17 (p. 16).

[18] '007 Patent – ECF No. 1-1 at 2 (at [57]).

[19] *Id.* at 11 (col. 3 ll. 50–56).

after releasing the load. A [person of ordinary skill in the art] would also know that because of viscoelasticity, the amount the laminate springs back depends on the length of time the laminate remains compressed. A laminate that is compressed for a long time will take longer to recover its original thickness, or may never completely recover that thickness.[20]

In response to the USPTO's citation of the McKinnon prior art, Cellulose explained that "[i]t may be that a honeycomb structured core can be 'smushed down' by pressing on it, but it is certainly not 'resiliently compressible.' Once 'compressed,' the honeycomb core would be permanently compressed."[21]

Cellulose contends that "resiliently compressible" and "resiliently expand" mean that the material can be compressed and then return to the non-compressed state once the compressing force is removed.[22] SC counters that the attribute of resiliency is indefinite: (1) it is a function of time, (2) it is a term of degree, and (3) claim 1 is a method claim that requires the step of providing a laminate that is resiliently compressible, later recites the step that the laminate "can be . . . compressed and allowed to resiliently expand," but never makes clear whether the claimed step of "providing" the laminate requires that it be actually compressed and allowed to resiliently expand.[23] SC Marketing elaborates that Cellulose's construction does not resolve the ambiguity and compounds it because it does not provide any guidance about the degree of resilience, meaning the degree of expansion following removal of the compressing force.[24]

The specification explains that the insulation is shipped flat and compressed for economy of shipment and, when unpacked at the customer's location, "expand[s] back to at least near [its] original thickness."[25] Considering the intrinsic evidence, the court construes the terms as "returns to the original form after being compressed." The prosecution history supports this construction: Cellulose distinguished the McKinnon prior art, which would be permanently compressed if

---

[20] Osswald Expert Report, Ex. H to Mitchell Decl. – ECF No. 47-9 at 18 (p. 17) (¶ 50)).

[21] 10/10/19 Resp., Ex. E to Mitchell Decl. – ECF No. 47-6 at 242 (p. 241).

[22] Pl.'s Corrected Opening Claim-Constr. Br. – ECF No. 47 at 18, 23.

[23] Def.'s Responsive Cl. Constr. Br. – ECF No. 49 at 13–14, 18–19.

[24] *Id.* at 14–15, 18–19.

[25] '007 Patent – ECF No. 1-1 at 11 (col. 3 ll. 44–61).

ORDER – No. 22-cv-03141-LB                              9

pressure was applied. Cellulose's expert describes a laminate that is viscoelastic, meaning, it springs back to nearly its original thickness. The term is not indefinite: the claim, read in light of the specification, "informs those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910.

### 3. Claim Term: "Fibrous Batt Comprised Primarily" (Claims 1, 20, 23)

The parties' proposed constructions are as follows:

| Claim Term: "Fibrous Batt Comprised Primarily" (Claims 1, 20, 23) ||
| --- | --- |
| **Cellulose** | **SC Marketing** |
| "A batt comprised chiefly/essentially of thermoplastic or (more specifically per some claims in suit) PET fibers" | "The fibrous batt is comprised mostly, but not entirely, of [thermoplastic/PET] fibers"[26] |

The patent describes the composition of the product: "[p]ackaging insulation for insertion into a packaging container, which includes an air laid thermoplastic fibrous batt having foldable thermoplastic film material adhered to both sides of the batt. Preferably the thermoplastic material of which the fibers and film are made is the same, and most preferably it is PET [polyethylene]."[27]

It reiterates:

> The present invention comprises packaging insulation for insertion into a packaging container, which includes a fibrous batt comprised of thermoplastic polymer fibers, having foldable thermoplastic polymer film adhered to both sides of the batt. . . . Preferably the same thermoplastic polymer is used for the polymer fibers and the polymer film, and preferably it is PET, and most preferably recycled and recyclable.[28]

Also,

> In the preferred embodiment, laminated packaging insulation **1** comprises a fibrous polyethylene terephthalate (PET) fiber batt **10**, laminated between two layers of PET film material **20** (FIG. 1). . . . While other thermoplastic polymers can be used for the fibers and film, preferably the same thermoplastic polymer is used for the polymer fibers and the polymer film, preferably it is PET, and most preferably recyclable and recycled. By using the same thermoplastic material for the fibers, the binder fibers

---

[26] Joint Claim-Constr. Statement – ECF No. 32-2 at 8 (p. 7).

[27] '007 Patent – ECF No. 1-1 at 2 (at [57]).

[28] *Id.* at 10 (col. 1 ll. 23–34).

and the film, the packaging insulation material may be readily recycled in commercial recycle centers. Recycled PET is the most preferable thermoplastic material. The non-woven PET fiber batt **10** is formed of PET staple fibers, preferably fibers made from recycled PET (recycled PET fibers), having a length between 20–72 mm, preferably between 20 to 60 mm. . . . As above, preferably the same thermoplastic polymer is used for the polymer binder fibers, the batt fibers and the polymer film, preferably it is PET, and most preferably recycled and recyclable. The PET film material used is preferably made from recycled PET (recycled PET film).[29]

Cellulose contends that its definition is meant to "exclud[e] the purposeful introduction of non-recyclable materials but admit[] of the presence of some impurities."[30] It cites its expert's statement that a person of ordinary skill in the art would understand that (1) "the constituency of the fibrous batt is made of thermoplastic materials with some impurities as are unavoidable given existing manufacturing technologies" and (2) "'primarily' would not admit of the purposeful introduction of non-recyclable materials."[31]

SC Marketing counters that the term necessarily excludes fibrous batts that are comprised entirely of thermoplastic or PET fibers. It cites the patent's "specification [that] teaches an embodiment where the PET fibers are 'mixed with' between 5% to 30% binder fibers" that are "heated together in an oven where they tack together to 'give the batt cohesion.'" "The specification teaches that these binder fibers are composed of a different material such as 'lower melting point resinous fibers such as polyolefin, PVA, or PVOH.'"[32]

Cellulose responds that this reading makes no sense: polyolefin, PVA, and PVOH are all thermoplastic materials (as science and a full reading of the intrinsic record show):

> From about 5 to about 30% thermoplastic binder fibers, more preferably about 10–25%, and most preferably about 15–20%, are mixed in with the PET fibers. Binder fibers may be lower melting point resinous fibers such as polyolefin, PVA or PVOH; or may be bi-component fibers including a higher melting point

---

[29] *Id.* (col. 1 ll. 58–67 to col. 2 ll. 1–40).

[30] Pl.'s Corrected Opening Claim-Constr. Br. – ECF No. 47 at 21.

[31] *Id.* (citing Osswald Expert Report, Ex. H to Mitchell Decl. – ECF No. 47-9 at 22–23 (pp. 21–22) (¶¶ 62–63)).

[32] Def.'s Responsive Cl. Constr. Br. – ECF No. 49 at 15 (quoting '007 Patent – ECF No. 1-1 at 10 (col. 2 ll. 11–34, 53–61)).

ORDER – No. 22-cv-03141-LB                    11

thermoplastic component associated with a lower melting point thermoplastic material . . . ."[33]

Also, it points out that the specification says that the packaging insulation product may be made "using the same thermoplastic material for the fibers, the binder fibers and the film."[34]

SC Marketing's argument — that the term excludes a batt comprised entirely of thermoplastic or PET fibers — is not consistent with the patent: the materials are all thermoplastic or PET fibers, and nothing suggests excluding fibrous batts composed only of those fibers. The issue then is how to construe the word "primarily:" Cellulose advances "chiefly/essentially," and SC Marketing suggests "mostly." These definitions do not add anything to "primarily." The court construes the term as "a batt comprised primarily of [thermoplastic or PET] fibers." *Phillips*, 415 F.3d at 1312–13 (generally terms are given their ordinary and customary meaning from the perspective of a person of ordinary skill in the art at the time of invention).

4. **Claim Terms: "Folded without the need for creases, grooves or cut lines" and "Foldable" (Claims 1, 20, 23)**

The parties' proposed constructions are as follows:

| Claims Terms: "Folded without the need for creases, grooves or cut lines" and "Foldable" (Claims 1, 20, 23) | |
|---|---|
| **Cellulose** | **SC Marketing** |
| Ordinary meaning | "Folded without the need for creases, grooves or cutlines" <br><br> "The laminate is free of hinges such as creases, grooves, and/or cut lines" <br><br> "Foldable" <br><br> "The thermoplastic film material may be bent over itself so that one part of it covers another such that when released it returns to its original form and is free of hinges such as creases, grooves, and/or cut lines""[35] |

---

[33] Pl.'s Reply – ECF No. 50 at 13 (quoting '007 Patent – ECF No. 1-1 at 10 (col. 2 ll. 11–34)).
[34] *Id.* (quoting '007 Patent – ECF No. 1-1 at 10 (col. 2 ll. 7–8)).
[35] Joint Claim-Constr. Statement – ECF No. 32-2 at 11 (p. 10), 20 (p. 19).

Cellulose contends that the context of the words — "a laminate which can be folded without the need for creases, grooves[,] or cut lines in said laminate to facilitate folding" — suggests an ordinary meaning of the word "folded."[36] Similarly, the word "foldable" has an evident meaning (corresponding to "folded") and also necessarily refers to the capability of being folded (rather than the condition of being folded).[37] SC Marketing counters that "can be folded" necessarily "refers to the absence of any hinges that form such creases, grooves, and/or cut lines" and "foldable" similarly requires the absence of the hinges.[38]

SC Marketing's proposed alteration is confusing, repeats the claim's language, and does not help the jury understand what the claim means to a person having ordinary skill in the art. *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011); *Phillips*, 415 F.3d at 1312–14. The patent language is clear: the batt is a "foldable laminate which can be folded without the need for creases, grooves, or cut lines to facilitate folding." The court gives the term its plain and ordinary meaning.

5. Claim Term: "Air Laid Thermoplastic Fibrous Batt" (Claims 1, 23)

The parties' proposed constructions are as follows:

| Claim Term: "Air Laid Thermoplastic Fibrous Batt" (Claim 1, 23) ||
|---|---|
| **Cellulose** | **SC Marketing** |
| "A batt comprising thermoplastic fibers, where the batt is formed using airlaying" | Does not encompass "rigid PET waddings"[39] |

SC Marketing contends that "air laid" excludes "rigid PET waddings" because during the patent prosecution, Cellulose distinguished its patent from SC Marketing's earlier-filed patent by

---

[36] Pl.'s Corrected Opening Claim-Constr. Br. – ECF No. 47 at 21–22; *see supra* Statement (quoting claims).

[37] Pl.'s Corrected Opening Claim-Constr. Br. – ECF No. 47 at 23–24.

[38] Def.'s Responsive Cl. Constr. Br. – ECF No. 49 at 16–17, 20–21.

[39] Joint Claim-Constr. Statement – ECF No. 32-2 at 26 (p. 25).

focusing on the earlier patent's use of rigid PET waddings.[40] Cellulose responds that it said only that it was aware of the earlier patent's packaging and did not distinguish its product.[41]

Matthew Henderson, one of the named inventors for Cellulose's patent, submitted a declaration during the patent prosecution that he was aware of SC Marketing's published patent application:

> I have also been made aware that (1) . . . Figs. 6–11 of the published application disclose a foldable packaging insulation for insertion into a packaging container; and (2) that Fig. 3 and Par. 53 and 56 disclose an alternative packaging insulation with a PET core with PET film on both sides, although the core is made of a rigid PET wadding, and thus is not resiliently collapsible or foldable like the claimed subject matter of our pending patent application.[42]

Cellulose repeated this statement:

> The pertinent subject matter of [SC Marketing's patent application] is: (1) Figs. 6–11 [of the published application] which disclose a foldable packaging insulation for insertion into a packaging container; and (2) Fig. 3 and Par. 53 and 56 which disclose an alternative packaging insulation with a PET core with PET film on both sides, although the core is made of a rigid PET wadding, and thus is not resiliently collapsible or foldable.[43]

This matters, SC Marketing asserts, because its application claimed an effective priority date several months earlier than the '007 patent at issue in this litigation. It characterizes Mr. Henderson's declaration as distinguishing SC Marketing's patent (by focusing on its use of rigid PET waddings) to avoid SC Marketing's patent being earlier, invalidating prior art.[44] Cellulose responds that the point of the declaration was not to distinguish prior art and instead was to point out that it was not prior art because SC Marketing derived it from its prior relationship with Cellulose.[45] Cellulose is correct: in the next paragraphs of his declaration, Mr. Henderson

---

[40] Def.'s Responsive Cl. Constr. Br. – ECF No. 49 at 22.

[41] Pl.'s Reply – ECF No. 50 at 17.

[42] 10/09/19 Henderson Decl., Ex. E to Mitchell Decl. – ECF No. 47-6 at 232 (p. 231) (¶ 4).

[43] 10/10/19 Resp., Ex. E to Mitchell Decl. – ECF No. 47-6 at 247 (p. 246).

[44] Def.'s Responsive Cl. Constr. Br. – ECF No. 49 at 22–23.

[45] Pl.'s Reply – ECF No. 50 at 18.

described how Cellulose and SC Marketing had a business relationship that gave rise to the packaging products at issue in SC Marketing's application.[46] He was not distinguishing prior art.

SC Marketing also contends that, even without an overt disclaimer, the statements make it clear that the invention does not include the feature of "rigid PET waddings."[47] Mr. Henderson's explanation does not arise to the level of a concession. *Cf. Thorner*, 669 F.3d at 1366 (can determine that there is a concession when the statement "makes clear that the invention does not include a particular feature").

The court construes the term as "A batt comprising thermoplastic fibers, where the batt is formed using airlaying."

## CONCLUSION

This resolves ECF Nos. 32, 47, 49 and 50.

**IT IS SO ORDERED.**

Dated: June 9, 2023

_____
LAUREL BEELER
United States Magistrate Judge

---

[46] 10/10/19 Henderson Decl., Ex. E to Mitchell Decl. – ECF No. 47-6 at 233–34 (pp. 232–33) (¶¶ 5–14).
[47] Def.'s Responsive Cl. Constr. Br. – ECF No. 49 at 23.