DICKINSON WRIGHT RLLP
Mark H. Rogge (SBN 298381)
615 National Ave, Suite 220
Mountain View, CA 94043
Telephone: (408) 701-6200
Facsimile: (844) 670-6009
mrogge@dickinsonwright.com

DICKINSON WRIGHT PLLC
Christopher A. Mitchell
(Admitted *pro hac vice*)
200 Ottawa Ave NE, Suite 1000
Grand Rapids, MI 49503
(616) 336-1058
cmitchell@dickinsonwright.com

DICKINSON WRIGHT PLLC
John S. Artz
(Admitted *pro hac vice*)
Yafeez S. Fatabhoy
(Admitted *pro hac vice*)
350 S. Main Street, Suite 300
Ann Arbor, MI 48104
(248) 433-7200
jsartz@dickinsonwright.com
yfatabhoy@dickinsonwright.com

*Attorneys for Plaintiff*
*Cellulose Material Solutions, LLC*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CELLULOSE MATERIAL SOLUTIONS, LLC<br><br>Plaintiff,<br><br>v.<br><br>SC MARKETING GROUP, INC.,<br><br>Defendant. | CASE NO.: 3:22-cv-03141-LB<br><br>**PLAINTIFF CELLULOSE MATERIAL SOLUTIONS, LLC'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY (Dkt. No. 141)**<br><br>DATE: February 29, 2024<br>TIME: 9:30 A.M.<br>PLACE: Courtroom B – 15th Floor,<br>JUDGE: Hon. Laurel Beeler |



## TABLE OF CONTENTS

**I.    INTRODUCTION** ...................................................................................................... 1

**II.   FACTUAL BACKGROUND** ..................................................................................... 1

**III.  LEGAL STANDARD** ................................................................................................ 4

**IV.   CMS'S JUNE 2015 EMAIL ISN'T AN "OFFER FOR SALE"** ........................... 4

**V.    TSS'S ANTICIPATION ARGUMENT FAILS BECAUSE CMS MADE THE**

**PATENTED PRODUCT** ................................................................................................. 10

**VI.   CONCLUSION** ......................................................................................................... 15

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

Cases

4

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
5     239 F.3d 1343 (Fed. Cir. 2001)..................................................................... 4
*Audionics System, Inc. v. AAMP of Fla., Inc.*,
6     2015 WL 12712288 (C.D. Cal. July 10, 2015) ........................................... 4
7 *Carhill, Inc. v. Canbra Foods, Ltd.*,
    476 F.3d 1359 (Fed. Cir. 2007)..................................................................... 5
8 *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*,
9     349 F.3d 1373 (Fed. Cir. 2003)..................................................................... 4
*Group One, Ltd. v. Hallmark Cards, Inc.*,
10     254 F.3d 1041 (Fed. Cir. 2001)..................................................................... 5
11 *Linear Tech. Corp. v. Micrel, Inc.*,
    275 F.3d 1040 (Fed. Cir. 2001)..................................................................... 5
12
*MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*,
13     731 F.3d 1258 (Fed. Cir. 2013)..................................................................... 4
*Medicines Company. v. Hospira, Inc.*,
14     827 F.3d 1363 (Fed. Cir. 2016)..................................................................... 5
15 *Merck & Cie v. Watson Lab'ys, Inc.*,
    822 F.3d 1347 (Fed. Cir. 2016)..................................................................... 5
16
*Pfaff v. Wells Elecs., Inc.*,
17     525 U.S. 55 (1998) .............................................................................. 6, 9, 10
*Robotic Vision Sys., Inc. v. View Eng'g, Inc.*,
18     112 F.3d 1163 (Fed. Cir. 1997)..................................................................... 4
19 *Trovan, Ltd. v. Sokymat SA*,
    299 F.3d 1292 (Fed. Cir. 2002)................................................................... 14
20
*UMC Elecs. Co. v. United States*,
21     816 F.2d 647, 2 USPQ2d 1465 (Fed.Cir.1987) ........................................... 6
22 *University of Rochester v. G.D. Searle & Co.*,
    358 F.3d 916 (Fed. Cir. 2004)....................................................................... 4

23

Statutes

24

25 35 U.S.C. § 102(a)(1)........................................................................................ 10
35 U.S.C. § 102(b)(1)........................................................................................ 11
26 35 U.S.C. § 282 ................................................................................................... 4
27 Section 102 ............................................................................................... 11, 13

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Section 102(b)(1)(A) ................................................................................. 12
Section 102(b)(1)(B) ........................................................................... 13, 14

Other Authorities

U.S. Patent No. 11,078,007 (the "'007 Patent") ............................................... 1, 3, 6

**D**/**W**
DICKINSON WRIGHT
ATTORNEYS AT LAW

## I.    INTRODUCTION

Plaintiff Cellulose Material Solutions LLC ("CMS") is the owner of U.S. Patent No. 11,078,007 (the "'007 Patent"), which is infringed by the RENEWLINER-brand packaging insulation product sold and offered for sale by Defendant SC Marketing Group, Inc., dba Thermal Shipping Solutions ("TSS").

TSS moved for summary judgment on the grounds of anticipation, arguing that: (1) CMS offered to sell the invention of the '007 Patent to TSS more than 1 year before CMS filed the application for that patent; and (2) TSS sold the infringing RENEWLINER product before CMS filed the application for the '007 Patent. However, TSS's arguments ignore the relevant facts and contradict established law. CMS's alleged "offer for sale" is nothing of the sort, lacking as it did sufficient terms to rise to the level of a "commercial offer." It was, instead, merely an inquiry of possible interest.  Further, TSS's allegedly anticipatory disclosure of the RENEWLINER product was a sale of product made for TSS **by CMS** and thus constitutes a disclosure obtained from the inventors of the '007 Patent (all of whom were CMS employees during the relevant timeframe). And since that activity occurred less than 1 year before the '007 Patent's filing date, it is an "excepted" public disclosure which cannot invalidate the patent.

## II.    FACTUAL BACKGROUND

A proper history of the parties' dealings between 2014 and 2016 provides context to the issues now before the Court.

TSS reached out to CMS in May of 2014[1], at a time when TSS lacked manufacturing or distribution capabilities of its own.[2] Exh. 1 at ¶ 3 (including Exh. A); Exh. 2 (TSS 3(b)(6) Dep.

---

[1] Defendant's president, Sal Cardinale, incorrectly declares that the relation began and ended in 2015.
[2] TSS continued to lack its own manufacturing facilities until at least late 2020, when it acquired a factory in Peru, Indiana, devoted to the manufacture of products other than the accused RENEWLINER. *See* **https://www.24-7pressrelease.com/press-release/481093/thermal-shipping-solutions-expands-production-into-new-markets**.

Tr.) at 133:15-134:23. Knowing that CMS had the manufacturing expertise and institutional knowledge to develop packaging solutions, TSS made first contact, reaching out **not** to request that CMS manufacture any specific product (as TSS wrongly implies[3]) but, instead, to procure samples of products CMS "currently suppl[ies] to other companies in our industry" to evaluate them as a possible packaging solution. *Id.*

In response to the inquiry, CMS initially provided TSS samples of a cellulose (i.e., paper) cotton-based product. Exh. 1 at ¶ 4; Exh. 3 (Henderson Dep. Tr.) 23:12-25; 24:1-5. Evaluation of this and other CMS product proposals followed in 2014 and 2015 as TSS continued to look to CMS for possible packaging solutions. Exh. 1 at ¶ 4; Exh. 3 (Henderson Dep. Tr.) 24:6-24; 26:13-27:18.

In 2015, CMS was internally developing a product comprised of a 100% PET core with PET film on both sides. Exh. 1 at ¶ 5; Exh. 3 (Henderson Dep. Tr.) 41:13-42:25; 50:15-21. Having received no significant interest from TSS as to any of its prior product proposals, CMS emailed TSS in June of 2015, alluding to this development as a something that might be of interest to TSS:

> As a final option, if CMS were able to produce a proprietary, insulative material just for TSS that was dust-free, easily recyclable in standard recycling systems, dark grey in color, and contained at least the same 85% recycled content as the Denim insulation, would Hello Fresh consider it? If so, by eliminating all the added costs of poly-coated paper facings, labor to wrap, etc... What material $/sqft target + diecutting cost ($0.26/ea flat-bed or $0.15/ea rotary die cutter) you could work with to win this business from Bonded Logic? I was estimating somewhere in the $0.43+/sqft range.. Did I mention this new material is highly compressible (similar to urethane foam) and could also be a cost-effective solution to those for your Kangaroo mailers you asked me to look at? When you get a few minutes, I would like to personally discuss this exciting material option with you? Thanks!

Ex. 2 to TSS's MSJ [Dkt. No. 141-3]; Exh. 1 at ¶ 5.

---

[3] Mr. Cardinale asserts that he "developed the idea of using a polyethylene terephthalate ('PET') batt with PET liners on both sides for packaging perishables," but needed "a manufacturing partner to create a refined finalized product." This assertion directly contradicts Mr. Cardinale's sworn deposition testimony, the self-serving testimony and lacks any evidentiary support.



Receiving favorable feedback from TSS in the weeks following this email, CMS continued its development of the product, Exh. 1 at ¶ 6; Exh. 3 (Henderson Dep. Tr.) 73:2-13, and by late 2015 was capable of making the product in commercial quantities and issued TSS a budgetary proposal. Exh. 1 at ¶ 6 (and accompanying Exh. B). These efforts culminated in a February 23, 2016, "Purchase Order" from TSS for the product, which was to be "private labelled" with the TSS name RENEWLINER (TSS supplied its own printed film for that purpose). Exh. 1 at ¶ 8 (and accompanying Exh. C). That product order, which was for third-party Dinner Thyme[4], was subsequently filled by CMS. Exh. 1 at ¶ 9 (and accompanying Exh. D). In June of 2016, shortly after completing the Dinner Thyme order, CMS filed the application that resulted in the patent in suit, U.S. Patent No. 11,078,007 ('the '007 Patent").[5] The '007 Patent's claims cover the product it developed: the same product which it manufactured for TSS under the RENEWLINER name.

The Dinner Thyme order was the last of CMS's inventive product that it made for TSS. Exh. 1 at ¶ 10. In 2016, with the benefit of CMS's disclosure, TSS enlisted two other third-party vendors, Turner Fiberfill and Carlee Corporation, to make the RENEWLINER product which CMS alleges infringes the '007 Patent.

---

[4] A now defunct home meal-kit delivery service.

[5] TSS erroneously asserts that CMS submitted a declaration during prosecution of the '007 Patent "[t]o avoid having its application rejected in view of TSS's earlier provisional patent application…." TSS Brief, p. 4. The USPTO never imposed any such rejection and, in fact, the USPTO examiner responded to the declaration by noting that it had been placed in the file but not considered. On the other hand, TSS followed up its' provisional application (Serial No. 62/299471) with a formal patent application (15/442526), filed after the application for the '007 Patent. That later TSS application attempted to claim the invention of the '007 Patent. The USPTO rejected those claims of the '007 Patent, and further rejected as futile TSS's efforts to bootstrap the disclosure of its earlier provisional application. In effect, the USPTO determined that the TSS provisional didn't disclose the invention TSS wanted to protect. *See, e.g.,* USPTO Rejection of 12/23/2022 in the official USPTO record here: ***https://patentcenter.uspto.gov/applications/15442526/ifw/docs?application*** =

## III.    LEGAL STANDARD

A duly issued patent is presumed valid, and the party claiming otherwise bears the burden of proving invalidity by clear and convincing evidence. *See, e.g.,* 35 U.S.C. § 282[6]; *MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1264 (Fed. Cir. 2013) ("To establish invalidity, the supporting facts must be shown by clear and convincing evidence"); *University of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 920 (Fed. Cir. 2004) ("[A] party 'seeking to invalidate a patent at summary judgment must submit ... clear and convincing evidence of invalidity' "); *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1377 (Fed. Cir. 2003) ("This court gives due weight to a patent's presumed validity under 35 U.S.C. § 282 (2000), and an accused infringer must show by clear and convincing evidence that a patent is invalid").

In the context of summary judgment, therefore, "the movant must demonstrate that there are no disputed material facts and show that the facts not in dispute constitute clear and convincing evidence that the patent is invalid." *Audionics System, Inc. v. AAMP of Fla., Inc.*, CV1210763MMMJEMX, 2015 WL 12712288, at *36 (C.D. Cal. July 10, 2015); (*quoting Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1358-59 (Fed. Cir. 2001) (*citing Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 112 F.3d 1163, 1165 (Fed. Cir. 1997)).

## IV.    CMS'S JUNE 2015 EMAIL ISN'T AN "OFFER FOR SALE"

Section 102 of the Patent Act, 35 U.S.C., provides that "[a] person shall be entitled to a patent unless…the claimed invention was patented, described in a printed publication, or in public

---

[6] *See* 35 U.S.C. § 282: "A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."

use, on sale, or otherwise available to the public before the effective filing date of the claimed invention…."

"Whether the on-sale bar applies is a question of law based on underlying factual findings." *Medicines Company. v. Hospira, Inc*., 827 F.3d 1363, 1371 (Fed. Cir. 2016) (*en banc*).  As a matter of law, "[o]nly an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)."  *Merck & Cie v. Watson Lab'ys, Inc.,* 822 F.3d 1347, 1351 (Fed. Cir. 2016) (quoting *Group One, Ltd. v. Hallmark Cards, Inc*., 254 F.3d 1041, 1048 (Fed. Cir. 2001)). This is an objective analysis, not a subjective one. That is, the alleged "offer" must bear the hallmarks of a commercial offer for sale, such as essential price, quantity, delivery and payment terms. *See, e.g., Merck & Cie,* 822 F.3d at 1351 (offer provided "essential price, delivery, and payment terms"); *Carhill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1369 (Fed. Cir. 2007)(offer "explicitly set[] forth an amount to be delivered…at a specified unit price, and under a standard contract designation, FOB"); *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1052 (Fed. Cir. 2001)(offers "included quantity terms and clearly identified the requested product").

In contrast, "mere preparations for commercial sales are not themselves 'commercial sales' or 'commercial offers for sale' under the on-sale bar." *Medicines Company*, 827 F.3d 1363. "[C]ontract law traditionally recognizes that mere advertising and promoting of a product may be nothing more than an invitation for offers, while responding to such an invitation may itself be an offer… Language suggesting a legal offer, such as 'I offer' or 'I promise,' can be contrasted with language suggesting more preliminary negotiations, such as 'I quote' or '***are you interested***.'" *Group One, Ltd.*, 254 F.3d 1041 (*internal citation omitted*)(*emphasis added*).

An accused infringer challenging a presumptively valid patent must demonstrate by clear and convincing evidence that "there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention." *UMC Elecs. Co. v. United States,* 816 F.2d 647, 656, 2 USPQ2d 1465, 1472 (Fed.Cir.1987); *see also Pfaff v. Wells Elecs., Inc.,* 525 U.S. 55, 67–68 (1998).

TSS incorrectly argues that the June of 2015 from CMS constitutes an invalidating offer for sale. This argument fails for one simple reason: The June 2015 email did ***not*** rise to the level of a "commercial offer for sale." It was nothing more than a solicitation of possible interest.

There is no question that, in June of 2015, there was in place no contract between the parties respecting sale of products covered by the '007 Patent. Exh. 3 (Henderson Dep. Tr.) 189:13-190:19. That did not occur until later (as discussed in Section V below). *Id.* So, the pertinent question here is whether this June 2015 email constituted a "commercial offer," even if an unaccepted one, to sell such products. It plainly did ***not***, as the language of the email makes clear.

The email starts with CMS stating "***if*** [we] were able to produce…." a proprietary product. Ex. 2 to TSS's MSJ [Dkt. No. 141-3](*emphasis added*). By the plain meaning of that statement, it is clear that the entire communication is qualified in respect of whether CMS could even make for TSS the product alluded to. The truth of this is certainly borne out by the subsequent time required for CMS to reach the point of being able to manufacture the product in commercial quantities. *Id*.

It is also telling of the nature of the communication that it closes with the line: "When you get a few minutes, I would like to personally discuss this exciting material option with you?" *Id.* This is manifestly a reflection of the fact that the communication was an inquiry of interest and an invitation to further discussion ***if*** that interest existed.

No less meaningful is what the email lacks but that would be needed in such a situation to rise to a commercial offer for sale, including delivery terms, product specifications, price, quantities, and payment terms.[7] It is helpful in these regards to contrast the June 2015 email with TSS's first "Purchase Order" of February 23, 2016 (which TSS cites, in support of its' "anticipation" argument, as evidencing the first "sale" of the infringing RENEWLINER). Exh. 1 at ¶ 8 (and accompanying Exh. C). That "Purchase Order" provides the items to be manufactured, their specifications ("Description"), the quantities, payment terms ("Net 30"), and shipping information ("Ship To"). *Id.* All of these terms were clearly necessary for TSS to issue a "Purchase Order" that CMS could accept.

Of these necessary terms, the June 2015 email provides nothing comparable. The product referenced is identified with no more detail than being "a proprietary, insulative material" that is "dust-free, easily recyclable in standard recycling systems, dark grey in color," containing "at least the same 85% content as the Denim insulation," and "highly compressible." Ex. 2 to TSS's MSJ [Dkt. No. 141-3]. Absent at least are the two key specifications associated with the "Items" of the TSS "Purchase Order": sizes and thickness. *Compare id.* and Exh. 1 at ¶ 8 (and accompanying Exh. C). There are no quantities, payment terms, or shipping details discussed. *Compare id.*

As for price, the CMS email lacks any firm pricing. Rather, it presents an "estimate" suggested in response to the rhetorical question: "What material $/sqft target + diecutting cost ($0.26/ea flat-bed or $0.15/ea rotary die cutter) you could work with to win this business from Bonded Logic?" Ex. 2 to TSS's MSJ [Dkt. No. 141-3]. Self-evidently, even this aspect of the email is no more than an invitation to further discussion.

---

[7] How can a commercial agreement for delivery of goods exist with a price or quantity term? It can't.

1    A final tell of the questing nature of the email is the fact that the potentiality of the product

2 for TSS is clearly contingent on its' being able to first convince a prospective customer to express

3 interest: "[I]f CMS were able to produce a proprietary, insulative material just for TSS…***would***

4 ***Hello Fresh consider it?***" Ex. 2 to TSS's MSJ [Dkt. No. 141-3].   At this juncture, the email

5 demonstrates that neither TSS nor CMS knew if third party Hello Fresh would even want the

6 product. Self-evidently, this first hurdle would have to be surmounted before either was in a

7 position to even discuss commercial terms between them.

8

9    In fact, the first "quote" made by CMS for this product, which was "budgetary" in nature

10 (meaning that it was not even a firm offer for sale but instead provided details for TSS to prepare

11 its own offer to TSS for the product), did not occur until much later in 2015. Exh. 1 at ¶ 6 (and

12 accompanying Exh. B). Like the "Purchase Order" from TSS, a comparison of this "quote" for the

13 product against the June 2015 email quickly verifies how far short that email is from what the

14 parties clearly understood to be an "offer for sale."

15

16    TSS tries in vain to make something of the deposition testimony of CMS's president, Matt

17 Henderson, as evidencing the nature of the June 2015 email as an "offer." But, as already noted,

18 the "offer for sale" analysis is not a subjective one. The alleged "offer" ***itself*** must bear the

19 hallmarks of a commercial offer that could, by acceptance, bind the offer or. The email lacks these

20 hallmarks and TSS provides no evidence to the contrary.   And, in any event, Mr. Henderson

21 himself explains his understanding that the June 2015 was an "offer" only in the sense that CMS

22 was proposing another possible product to TSS to gage its' possible interest, much as it had been

23 doing up to that point in regards to other potential products. Exh. 1 at ¶ 5. Indeed, Mr. Henderson

24 points out that CMS does not make commercial offers that lack specifics as to at least price,

25 quantity, payment terms, delivery terms, and the specific product being manufactured. *Id*.

26

27

28

In sum, the June 2015 email from CMS fails to satisfy the legal requirements of a "commercial offer for sale." Not only is its' nature such that TSS could not have bound CMS by "acceptance"; there was, more fundamentally, nothing to "accept" apart, perhaps, from the invitation to further discussion about TSS's interest in the potential product.

While the clear lack of a "commercial offer" is enough to dispose of TSS's motion in these regards, it is worth noting the lack of clear and convincing evidence cited in support of the second necessary prong of the "offer for sale" bar; namely, that the invention be "ready for patenting." *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998) (The claimed invention must be both (1) the subject of a commercial offer for sale; and (2) ready for patenting.).

An invention is "ready for patenting" if it can be shown that it was "reduced to practice" or "drawings or other descriptions" exist which are "sufficiently specific to enable a person of ordinary skill to practice the claimed invention." *Id.* at 67-68, 119 S.Ct. 304.

Bearing the burden of proof by "clear and convincing" evidence, TSS offers up on this point no more than the vague deposition testimony of CMS's president, Matt Henderson, and its' general manager, Kevin Chase. However, Mr. Chase, who is a named inventor of the '007 Patent and whom CMS has identified in interrogatory responses as being a joint inventor of subject matter of a number of the claims in suit, including each of the independent claims 1, 20, and 23, wasn't even an employee of CMS until *after* the June 2015 email. Exh. 1 at ¶ 7; Exh. 4 at pp. 9-18; Exh. 5 (Chase Dep. Tr.) at 32:16-20; 34:11-12; Exh. 4. Indeed, Mr. Chase testified in deposition as to his role in bringing about the invention of claim 1:

> Q. From the moment you started at CMS, what was your involvement in getting the invention that became claim 1 suitable for, I guess, use of its intended purpose as a packaging insulation?
>
> MR. MITCHELL: Asked and answered.



THE WITNESS: So you know, like I said, just because you have a piece of thermoplastic doesn't mean that it can be foldable, it doesn't mean you don't have to put crease lines in it in order to get it to erect in a box properly. That's something that we worked on together, getting it to uniform thickness, resiliently compressible, foldable; that was all led by me and involved with by the whole team.

Exh. 5 (Chase Dep. Tr.) at 40:12-25.

TSS distorts Mr. Chase's testimony regarding a "minimum viable prototype" in an effort to demonstrate that the invention was "ready for patenting." But that is contrary to Mr. Chase's clear testimony that the invention couldn't have been ready for patenting on June 15, 2015, because of his involvement in reducing the invention to practice *after* his employment began in August of 2015. *See Pfaff*, 525 U.S. at 67-68 (An invention is "ready for patenting" if it can be shown that it was "reduced to practice" or "drawings or other descriptions" exist which are "sufficiently specific to enable a person of ordinary skill to practice *the claimed invention*." (*Emphasis added*)).

## V.    TSS'S ANTICIPATION ARGUMENT FAILS BECAUSE <u>CMS</u> MADE THE PATENTED PRODUCT

TSS contends that the '007 Patent is invalidated based on alleged prior sale of the RENEWLINER product. TSS's theory, if ultimately flawed, is simple: It claims to have sold the accused RENEWLINER product on February 23, 2016, before the June 27, 2016, filing date of the '007 Patent. TSS asserts that this is an invalidating prior disclosure of the invention. A glaring problem with this theory, manifest by TSS's own evidence in "support," is that the product allegedly disclosed by TSS in February of 2016 is CMS's own product. That is, it is the patented product made by CMS for TSS's customer, third party Dinner Thyme.

The legal premise for TSS's position is the same section of the Patent Act relied on above; namely, 35 U.S.C. § 102(a)(1) ("A person shall be entitled to a patent unless…the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention…."). In this

instance, however, the timing between the alleged February 2016 sale and the June 2016 filing date of the '007 Patent is particularly important under Section 102, which provides, *inter alia*, the following exception:

> A disclosure made 1 year or less before the effective filing date of a claimed invention shall not be prior art to the claimed invention under subsection (a)(1) if...the disclosure was made by the inventor or joint inventor or by another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor.... 35 U.S.C. § 102(b)(1).(A).

In other words, this exception provides that a disclosure by the inventor (or someone who obtained the disclosed subject matter from the inventor) has no prior art effect if made within a year of the patent's effective filing date.

In evidence of the allegedly anticipating public disclosure, TSS provides Sal Cardinale's declaration attesting that TSS began selling the accused RENEWLINER product in February 23, 2016." Ex. 1 to TSS MSJ [Dkt. No. 141-2], ¶ 5. In corroboration, TSS's motion calls out a "Purchase Order" bearing the February 23, 2016, date. Ex. 5 to TSS MSJ [Dkt. No. 141-6]; *see also* Exh. 1 at ¶ 8 (and accompanying Exh. C). What that document clearly reflects, but TSS fails to call out in its brief, is that the "Purchase Order" was issued by TSS **to CMS**. *Id.* This is plain enough in the following extract from that document:

| **Thermal Shipping Solutions**<br>Mill Valley, CA 94941<br><br>Ph: 415-389-5004  Fx: 415-389-9007<br>info@thermalshipping.com | **Purchase Order** | |
|---|---|---|
| | Date | P.O. No. |
| | 2/23/2016 | 12964 |

| Vendor: | Ship To: |
|---|---|
| Cellulose Material Solutions LLC<br>2472 Port Sheldon<br>Jenison, MI 49428<br>United States | Dinner Thyme<br>1257 RANDALL AVE<br>BRONX, NY 10474-6412<br>United States |



Indeed, Mr. Cardinale confirmed under oath that the Dinner Thyme "Purchase Order" was to CMS and that it was associated with at least "one of the first" TSS sales of RENEWLINER. Exh. 2 (TSS 3(b)(6) Dep. Tr.) at 101: 11 to 102:16.

CMS did, in fact, fill that order (though the product was not shipped until some months later), as evidenced by the copy of the "Purchase Order" marked "RECEIVED IN FULL." Exh. 1 at ¶ 9 (and accompanying Exh. D).

The allegedly anticipatory public disclosure in this instance was, unquestionably, therefore, "made by…another [i.e., TSS] who obtained the subject matter disclosed [the RENEWLINER product] directly or indirectly from the inventor or a joint inventor [i.e., via CMS, employee of the inventors]...." in satisfaction of the "exception" of Section 102(b)(1)(A). That is, the RENEWLINER product allegedly sold by TSS, less than 1 year before the '007 Patent was filed, was obtained from CMS. This is at least an "indirect" obtaining of the RENEWLINER product from one or more inventors of the '007 Patent, all of whom were CMS employees during the relevant timeframe.

TSS admits turning to other vendors *after* working with CMS[8]. Ex. 1 to TSS MSJ [Dkt. No. 141-2], ¶¶ 3-4. Those vendors include Turner Fiberfill and Carlee Corporation, among others. *Id.* at ¶ 4. But the evidence reflects that TSS did *not* begin working with most of these vendors until 2017 or later. *See* Exhs. 6-9. The only exceptions are Turner Fiberfill and Carlee Corporation. TSS enlisted Turner Fiberfill in manufacturing the RENEWLINER product after the start of 2016. Exh. 10 (Turner 30(b)(6) Dep. Tr.) at 17:25-18:22; 42:13-47:14. The very first RENEWLINER "Purchase Order" to Turner Fiberfill is dated April 22, 2016. Exh. 11. The parties didn't formalize a manufacturing agreement until July of that year. Exh. 12. And Turner's president testified in

---

[8] Contrary to Mr. Cardinale's sworn assertion, TSS's own evidence in support of its' Motion shows that the relationship with CMS did not end in 2015.

deposition that Turner didn't ship any RENEWLINER product until after the manufacturing

agreement was signed. Exh. 10 (Turner 3(b)(6) Dep. Tr.) at 42:13-43:8. As for Carlee Corporation,

their manufacturing agreement with TSS is dated late 2016 (*see* Exh. 13), while their president

testified no RENEWLINER products were made by it prior to 2016. Exh. 14 (Carlee 30(b)(6) Dep.

Tr.) at 18:25 – 19:9.

On TSS's facts, with the CMS manufacture of RENEWLINER clearly preceding that of

any of TSS's "other vendors," a further exception under Section 102 is also applicable; namely,

Section 102(b)(1)(B), which provides:

> A disclosure made 1 year or less before the effective filing date of a claimed invention shall not be prior art to the claimed invention under subsection (a)(1) if…the subject matter disclosed had, ***before* such disclosure, been publicly disclosed by the inventor or a joint inventor or another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor**. (*Emphasis added*.)

In other words, this exception provides that a disclosure occurring after disclosure by the inventor

(or someone who obtained the disclosed subject matter from the inventor) – an "intervening

disclosure" – has no prior art effect.

In respect of this "exception" on the facts of this case, the February 23, 2016,

RENEWLINER "Purchase Order" satisfied by CMS -- if constituting a public disclosure within 1

year of the '007 Patent's June 2016 filing date – clearly precedes the "disclosures" that may have

arisen from subsequent RENEWLINER products manufactured by Turner Fiberfill or Carlee

Corporation (sales by others of the named vendors, none of whom began manufacturing the

product until after the '007 Patent's application was filed, are immaterial). In other words, the

February 23, 2016, "sale" relied on by TSS as an "anticipatory disclosure" would, on Defendant's

theory, constitute a disclosure made "by the inventor or a joint inventor or another who obtained

the subject matter disclosed directly or indirectly from the inventor or a joint inventor" (i.e., by

TSS through CMS) "before" disclosure by Turner Fiberfill or Carlee Corporation.[9] Section 102(b)(1)(B).

It is worth noting that, to the extent TSS is taking the position that the February 23, 2016, RENEWLINER sale was of its own invention, **CMS** is the owner of the '007 Patent.  Such a position by TSS is a dispute of inventorship (which is not raised in Defendant's motion) with respect to which Mr. Cardinale's unsubstantiated, contradictory, and self-serving statements are legally insufficient to meet the "clear and convincing" standard for establishing inventorship. *See, e.g., Trovan, Ltd. v. Sokymat SA,* 299 F.3d 1292, 1302 (Fed. Cir. 2002).

Finally, a brief word is due about the expert report accompanying TSS's Motion.

TSS's expert opines on two RENEWLINER products he was provided and which are allegedly from 2016 and 2023.[10] The ostensible purpose of these two samples is to compare their construction in support of the conclusion that the two samples are immaterially different. Ex. 1 to TSS MSJ [Dkt. No. 141-2], ¶ 5; Ex. 6 to TSS MSJ [Dkt. No. 141-7]. On the facts presented by TSS, the conclusion is also immaterial for purposes of TSS's motion since CMS was the first manufacturer of the RENEWLINER product.[11] Nonetheless, it is notable that TSS provides **no** evidence as to the provenance of either sample; i.e., who was the manufacturer of each or precisely when (particularly as to the alleged 2016 sample) it was made. Nor did TSS produce, in any form, either sample during fact discovery. Rather, both "sprang into existence" in support (however weakly) of TSS's Motion. All other considerations aside, the "facts" purportedly represented by

---

[9] And, of course, there is no evidence that Turner Fiberfill or Carlee Corporation even "disclosed" the RENEWLINER product before the '007 Patent's filing date in any case.

[10] This alone is curious, inasmuch as TSS has taken the position in this litigation in response to discovery requests that is could not produce samples of the accused product because it lacks control over its vendors.

[11] The concession of infringement will, however, be material to CMS's own motion for summary judgment of infringement which it plans to bring imminently.

the samples in respect of an allegedly anticipatory disclosure hardly rise to the level of "clear and convincing evidence."

## VI.    CONCLUSION

The great irony of TSS's position is that, in accusing CMS of offering the invention of the '007 Patent for sale to TSS well before any other third-party vendors of the accused RENEWLINER product were in the picture, it necessarily acknowledges CMS's original role in producing the RENEWLINER product that is covered by the '007 Patent. TSS cannot have it both ways.  Indeed, on the facts in evidence, TSS cannot have it either way, for CMS was the first to manufacture for TSS the product covered by the '007 Patent and did ***not*** extend a commercial offer for sale of its invention more than 1 year before the patent application was filed.

Consequently, CMS requests that TSS'S Motion for Summary Judgment (Dkt. No. 141) be denied.

Dated: January 30, 2024.           **DICKINSON WRIGHT PLLC**

By:/s/ Chris Mitchell

Christopher A. Mitchell. (Admitted *pro hac vice*)
**DICKINSON WRIGHT PLLC**
200 Ottawa Ave NE, Suite 1000
Grand Rapids, MI 49503
Telephone: (616) 336-1058
cmitchell@dickinsonwright.com


John S. Artz (Admitted *pro hac vice*)
Yafeez S. Fatabhoy (Admitted *pro hac vice*)
**DICKINSON WRIGHT PLLC**
350 S. Main Street, Suite 300
Ann Arbor, MI 48104
Telephone: (248) 205-3264
jsartz@dickinsonwright.com
yfatabhoy@dickinsonwright.com

Mark H. Rogge
**DICKINSON WRIGHT RLLP**
615 National Ave, Suite 220
Mountain View, CA 94043
Telephone: (408) 701-6200
mrogge@dickinsonwright.com

*Attorneys for Plaintiff Cellulose Material Solutions, LLC*

1

## **<u>CERTIFICATE OF SERVICE</u>**

2     I hereby certify that on this 30th day of January, 2024, a true and correct copy of this

3 document was served electronically via the Court's CM/ECF system to all attorneys of record.

4

5                           */s/ Chris A. Mitchell*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

