DICKINSON WRIGHT RLLP
Mark H. Rogge (SBN 298381)
615 National Ave, Suite 220
Mountain View, CA 94043
Telephone: (408) 701-6200
Facsimile: (844) 670-6009
mrogge@dickinsonwright.com

DICKINSON WRIGHT PLLC
Christopher A. Mitchell
(Admitted *pro hac vice*)
200 Ottawa Ave NE, Suite 1000
Grand Rapids, MI 49503
(616) 336-1058
cmitchell@dickinsonwright.com

DICKINSON WRIGHT PLLC
John S. Artz
(Admitted *pro hac vice*)
350 S. Main Street, Suite 300
Ann Arbor, MI 48104
(248) 433-7200
jsartz@dickinsonwright.com
yfatabhoy@dickinsonwright.com

*Attorneys for Plaintiff*
*Cellulose Material Solutions, LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CELLULOSE MATERIAL SOLUTIONS, LLC<br><br>Plaintiff,<br><br>v.<br><br>SC MARKETING GROUP, INC.,<br><br>Defendant. | CASE NO.: 3:22-cv-03141-LB<br><br>**PLAINTIFF CELLULOSE MATERIAL SOLUTIONS, LLC'S SUPPLEMENTAL BRIEFING RESPECTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY (Dkt. 141)**<br><br>DATE: March 28, 2024<br>TIME: 9:30 A.M.<br>PLACE: Courtroom B – 15th Floor,<br>JUDGE: Hon. Laurel Beeler |



## I. INTRODUCTION

### A. *Procedural Posture*

Defendant SC Marketing Group, Inc., dba Thermal Shipping Solutions ("TSS") moved for a summary determination that the patent in suit, U.S. Patent No. 11,078,007 (the "'007 Patent"), is invalid on the grounds of (i) an alleged prior offer for sale of the claimed invention to TSS by Plaintiff Cellulose Material Solutions LLC ("CMS") and (ii) TSS's alleged prior "manufacturing and selling of the RENEWLINER product since at least as early as February 23, 2016," as evidenced by a purchase order from TSS to CMS for product to third party DinnerThyme. TSS's MSJ [Dkt. 141] at p. 7. This Court subsequently determined that the June 2015 email from Chris Benner, CMS's Sales Manager, to Sal Cardinale at TSS was ***not*** a commercial offer for sale of the invention of the '007 Patent, thereby disposing of the invalidity grounds (i) mentioned above. [Dkt. 148.] Following the motion hearing on February 29th, supplemental briefing was allowed. [Dkt. 163.]

### B. *Background*

TSS came to CMS in mid-2014 seeking packaging solutions/options from CMS to use for its customers. Exh. 1 to CMS's Response [Dkt. 149-2] at ¶ 3 (including Exh. A); Exh. 2 to CMS's Response [Dkt. 149-3] (TSS 3(b)(6) Dep. Tr.) at 133:15-134:23. At that time, TSS manufactured nothing.[1] *Id*. Rather, it sought manufacturers who could propose and manufacture packaging insulation products for its customers. Initially, TSS requested, and CMS provided, samples of CMS's existing packaging product offerings. Exh. 1 to CMS's Response [Dkt. 149-2] at ¶¶ 3-4 (including Exh. A); Exh. 3 to CMS's Response [Dkt. 149-4] (Henderson Dep. Tr.) 23:12-25; 24:1-

---

[1] TSS continued to lack its own manufacturing facilities until at least late 2020, when it acquired a factory in Peru, Indiana, devoted to the manufacture of products other than the accused RENEWLINER. *See* **https://www.24-7pressrelease.com/press-release/481093/thermal-shipping-solutions-expands-production-into-new-markets**.

1

5. CMS then proceeded to propose – and, indeed, worked on developing for TSS -- a number of other concepts for possible packaging solutions over the ensuing year-plus duration of the parties' relationship. Exh. 1 to CMS's Response [Dkt. 149-2] at ¶ 4; Exh. 3 to CMS's Response [Dkt. 149-4] (Henderson Dep. Tr.) 24:6-24; 26:13-27:18. These proposals included, among others, the CMS invention that would ultimately be the subject of the '007 Patent. Like any business, CMS hoped the relationship would result in long-term business supplying packaging products to TSS and its customers. TSS had other plans. Appreciating the groundbreaking nature of the CMS invention but not wanting to pay CMS's prices, TSS took the fruit of CMS's innovation (the packaging solution CMS proposed and protected by way of the '007 Patent) and turned to other vendors to produce the CMS developed product for TSS. It conveyed the particulars of that innovation to these vendors, seeking to deprive CMS of the business tied to its innovation.

  In the ensuing years between the '007 Patent's filing and issuance, TSS CMS' novel packaging solution into its flagship product (which it calls RENEWLINER), boasting to the market about "the world's first curbside recyclable insulated shipping system" that has been "awarded Most Sustainable Temperature-Sensitive Project." Exh. 15 (TSS_00000739).

  Now, despite touting the novelty of the RENEWLINER and claiming that TSS's president, Sal Cardinale, is a joint inventor of the '007 Patent (*see* [Dkt. 85] at ¶¶ 28-29, 32-34), TSS asks this Court to invalidate the '007 Patent based on TSS's own alleged sales activity of CMS' inventive packaging solution undertaken within the months leading to the '007 Patent's filing. However, the facts show that the RENEWLINER TSS brought to its customers was CMS's very own product and, as such, it is not prior art to the '007 Patent.



## II. LAW AND ARGUMENT

### A. *TSS's Ever-Changing Position*

TSS's argument for invalidity has morphed considerably since its original Motion (Dkt. 141). In Reply (Dkt. 152), TSS newly argued that third party Turner sold the RENEWLINER product before the application for the '007 Patent was filed[2], citing an April 22, 2016, Purchase Order from TSS to Turner. It also argued that CMS failed to show that the Turner RENEWLINER product was obtained, directly or indirectly, from CMS.[3] Then, at the February 29th hearing, TSS appeared to pivot yet again, this time asserting that the Turner Purchase Order itself represented an offer for sale of the Turner RENEWLINER even if the product was not actually shipped until after the '007 Patent's filing date.

TSS also appeared to pivot on the DinnerThyme Purchase Order at the February 29th hearing, now arguing that this is an "offer for sale." Here again, TSS tries to shift the burden to CMS, asserting that CMS fails to show that the DinnerThyme RENEWLINER product that is the subject of this alleged offer for sale was obtained from CMS.

### B. *Anticipation under 35 U.S.C. Section 102*

The only way for any single prior art reference to invalidate a patent's claims is through "anticipation"; that is, a showing that the invention as claimed is not novel. Section 102 of the Patent Act, 35 U.S.C. specifies the conditions for establishing the "novelty" of a claimed invention. It provides, in pertinent part, "that "[a] person shall be entitled to a patent unless…the claimed invention[4] was patented, described in a printed publication, or in public use, on sale, or otherwise

---

[2] The application for the '007 Patent was filed on June 27, 2016.
[3] Of course, the point of CMS's Response (Dkt. 149) was to demonstrate, contrary to TSS's original argument, that the RENEWLINER product TSS was "manufacturing and selling" since February 23, 2016, could only be the very product CMS developed and made. This having been accomplished, TSS could only make a new argument.
[4] The "claimed invention" means just what it says. The prior art reference must comprehend all claimed elements.

available to the public before the effective filing date[5] of the claimed invention...." 35 U.S.C. § 102(a)(1).

The proscriptions of Section 102 are not absolute; a number of exceptions are provided. Relevant to this case are the exceptions of Section 102(b), which states that "[a] disclosure made 1 year or less before the effective date of the claimed invention shall not be prior art to the claimed invention under subsection (a)(1) if" one of the following applies:

> (A)   The disclosure was made by the inventor or joint inventor or by another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor;
>
> (B)   The subject matter disclosed had, before such disclosure, been publicly disclosed by the inventor or a joint inventor or another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor.

While there are other shortcomings to TSS's Motion, at least one question for the Court is: Do the DinnerThyme sale and the Turner Purchase Order fall under either of these exceptions? If so, summary judgment is inappropriate. Of course, a further issue is whether TSS's evidence satisfies its burden to demonstrate invalidity by clear and convincing evidence.

C.   *The DinnerThyme Order was for the CMS-Product*

Section 102(b)(1)(A) excepts disclosures "made by…another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor…."

Following internal development in early 2015, CMS first alluded to its packaging insulation product comprising a core, or batt, of 100% PET fiber, with PET film on both sides of the batt in the June 2015 email to TSS. Exh. 1 to CMS's Response [Dkt. 149-2] at ¶ 5. There had been no discussion between the parties of such a product earlier, and certainly TSS never suggested

---

[5] The "effective filing date" means the earliest filing date to which the patent or application is entitled. Here, that date is June 27, 2016.

it. From soon after that June 2015 email, CMS worked at least in part[6] on developing this innovation for production and, ultimately, sale to TSS.

In early November of 2015 TSS emailed CMS asking for pricing on the CMS product with 100% PET fiber, with PET film on both sides of the batt. Exh. 16, pp. 1-2 (CMS0006181). CMS sent a Budgetary Quote a day later, specifying the details of the product. *Id.* at p. 1; and Exh. 17 (CMS0006183). The Budgetary Quote provided TSS with specifics to aid in turning around and trying to sell the product to its customers and, thereafter, issuing Purchase Orders to CMS.

That same month, CMS ran production-scale testing of this product. Exh. 18 (Chase Declaration) at ¶ 5 (including Exhibit A). Samples of the products made during this testing were provided to TSS before the end of 2015. *Id.*

TSS also emailed CMS on January 5, 2016, asking for pricing on this product (100% PET fiber, with PET film on both sides of the batt), stating that TSS was "getting really close to getting something substantial here for you guys." Exh. 19, p. 2 (CMS0032642). CMS followed up this email the very next day with two Budgetary Quotes for the product, specifying that the "Project" was for third party DinnerThyme. *Id.* at p. 1; and Exhs. 20 (CMS0032645) and 21 (CMS0032646).

In a subsequent internal TSS email, dated prior to the DinnerThyme Purchase Order issued to CMS, the CMS email with these Budgetary Quotes was characterized as "the quote that [CMS] gave me for Rick Fay of DinnerThyme." Exh. 22 (TSS_00001376). Even before then, however, TSS contacted CMS via email to advise that TSS "closed DinnerThyme"; i.e., secured the business to provide the CMS-produced product. Exh. 23 (CMS001658). CMS's Sales Manager, Chris Benner, promptly conveyed this news via an internal CMS email. *Id.* The DinnerThyme Purchase Order (Exh. 1 to CMS's Response [Dkt. 149-2] at p. 12) followed a few weeks later.

---

[6] During the latter half of 2015 TSS also continued to be interested in a number of other CMS-provided packaging solutions, including, among others, poly-bagged materials and paper-faced denim.

It is more than plain from this history of communications and development that the product offered to DinnerThyme was the CMS innovation. That is, what TSS offered to sell to DinnerThyme was the very product CMS had proposed and developed. There can be no clearer evidence that the "subject matter" of the DinnerThyme order was "obtained" from CMS (who was, in turn, the employer of all persons named in the '007 Patent and, consequently, itself had possession of the subject matter disclosed from those inventors). Thus, TSS fails to carry its burden to show, by clear and convincing evidence, that the DinnerThyme order is invalidating.

D.  *TSS Provided Product Specifications to Turner, Not the Other Way Around*

Turner didn't come up with the RENEWLINER product out of the blue, as TSS seems to argue in Reply [Dkt. 152]. As its president, Paul Turner, testified in deposition, TSS told Turner how to make the RENEWLINER product. Exh. 24 (Turner Dep. Tr.) 23:14-25:11. Indeed, the Exclusive Manufacturing Agreement between TSS and Turner reinforces the conclusion that, as between them, TSS is the source of confidential product details. Exh. 12 to CMS's Response [Dkt. 149-13] at pp. 1 and 5-6.

Given the above-recited, preceding history between CMS and TSS, the RENEWLINER product which TSS ordered from Turner in April of 2016 for third party Juicero (Exh. 11 to CMS's Response [Dkt. 149-12]) was manifestly the very same product CMS developed. This is reflected in the Turner Purchase Order itself, which reads much like the February DinnerThyme Purchase Order. *Compare* Exh. 1 [Dkt. 149-2], p. 12 and Exh. 11 [Dkt. 149-12]. Again, TSS fails to carry its burden to show, by clear and convincing evidence, that the Juicero order is invalidating.

E.  *The Juicero Purchase Order Isn't an Offer for Sale*

Since Turner's president testified that Turner didn't ship any RENEWLINER product until after the July 2016 date of the Exclusive Manufacturing Agreement (*see* Exh. 10 to CMS's



6

Response [Dkt. 149-11] (Turner 3(b)(6) Dep. Tr. at 42:13-43:8), TSS must argue that the Juicero Purchase Order constitutes an invalidating offer for sale. However, this position is problematic.

First, evidence of a prior offer for sale requires clear and convincing proof of a commercial offer of the claimed invention. *See, e.g., FMC Techs., Inc. v. OneSubsea IP UK Ltd.*, 412 F. Supp. 3d 706, 713 (S.D. Tex. 2019); *see also* 35 U.S.C. § 102 ("[t]he claimed invention was…on sale"). The Juicero Purchase Order itself is not evidence of a commercial offer for sale to third party Juicero. It is evidence ***only*** that TSS ordered Turner to make the product.

Nor does the April 2016 Purchase Order demonstrate that TSS offered Juicero the Turner RENEWLINER (which TSS argues is "different" subject matter by virtue of having a carded and lapped fibrous batt). As already noted, it was TSS that conveyed the RENEWLINER specifications to Turner. TSS may, indeed, have offered Juicero product based on samples obtained from CMS (the only party making the product at the time) or on the basis of the product literature which Sal Cardinale testified was in existence prior to May of 2016. Exh 25 (Cardinale Dep. Tr.) 125:1-25 and Exh. 23 thereto. That product literature was shared by Mr. Cardinale with DinnerThyme, and discloses CMS's innovation (as well as pictures of product evidently manufactured by CMS, given the timing of the literature's creation). (*Id.*)

In short, while Turner may have ultimately shipped its version of the RENEWLINER to Juicero at some point ***after*** the '007 Patent's application was filed, there is scant evidence (and certainly nothing clear and convincing) that the Juicero Purchase Order to Turner reflects an offer for sale to Juicero of the ***Turner*** RENEWLINER.

F. *CMS Provided its Innovative Product to TSS and Others*

**Even if** TSS could establish by clear and convincing evidence that it offered the **Turner** RENEWLINER product to Juicero, the fact remains that the CMS innovation was disclosed to others before then, including by the provision of samples and product specifications.

In addition to product samples and specifications sent to TSS before the end of 2015 as described above, CMS provided TSS and others with samples of its innovative product, including as follows:

CMS made samples of this same product in December of 2015 and sent them directly from CMS to third party Nurture Life for evaluation. Exh. 18 (Chase Declaration) at ¶ 6 (including Exhibit B).

CMS again made samples of its innovative product in December of 2015 and sent them to TSS. *Id.* at ¶ 7 (including Exhibit C).

In January of 2016, CMS made further product samples and sent them to Ben Scott at TSS. *Id.* at ¶ 8 (including Exhibits D and E). As reflected in the email from TSS, the samples were for third party Munchery's evaluation and testing. (*Id.*)

Thus, even before the DinnerThyme Purchase Order, CMS (the employer of all named inventors of the '007 Patent) had itself put TSS and Nurture Life in possession of the innovation of the '007 Patent. And, through TSS, a similar disclosure had been made to third party Munchery.

The relevance of these prior disclosures of the invention of the '007 Patent is that they at the very least defeat the applicability of the Turner RENEWLINER as anticipatory prior art under Section 102(b)(1)(B):

> The subject matter disclosed had, before such disclosure, been publicly disclosed by the inventor or a joint inventor or another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor.



8

For, assuming, *arguendo*, that the April 2016 Purchase Order (from TSS to Turner) reflects an earlier or concurrent offer for sale to Juicero of RENEWLINER *as manufactured by Turner*, it reduces that offer to an intervening disclosure that is operable as prior art with respect ***only*** to the different subject matter; i.e., the creation of a fibrous batt by carding and lapping. This is manifest by the U.S. Patent Office's Manual of Patent Examining Procedure (MPEP), Section 2153.02, which provides:

> The subject matter of an intervening grace period disclosure ***that is not in the inventor-originated prior public disclosure*** is available as prior art under AIA 35 U.S.C. 102(a)(1). For example, if the inventor or a joint inventor had publicly disclosed A, B, and C, and a subsequent intervening grace period disclosure discloses A, B, C, and D, then D remains available as prior art under AIA 35 U.S.C. 102(a)(1) even though the AIA 35 U.S.C. 102(b)(1)(B) exception applies such that A, B, and C are not prior art. In other words, the exception in AIA 35 U.S.C. 102(b)(1)(B) does not necessarily remove the entire disclosure in the intervening reference from being prior art. (*Emphasis added*.)

Further elucidation on this issue is provided in MPEP Section 717.01(b)(2):

> ***Only*** the portion of the third party's intervening disclosure that was previously in an inventor-originated disclosure (i.e., the same subject matter) is excepted as prior art under 35 U.S.C. 102(a). In other words, any portion of the third party's intervening disclosure that was not part of the previous inventor-originated disclosure is still available for use in a prior art rejection. (*Emphasis added*.)

In short, even under the hypothetical where the Turner RENEWLINER could be prior art, it could not serve to invalidate the '007 Patent because the "different" subject matter pertains only to the formation of a fibrous batt by carding and lapping. The remaining aspects of the Turner RENEWLINER are, by TSS's own admission, the same as the '007 Patent and, thus, comprehended by CMS's prior disclosures.

Of course, for present purposes it is enough that the Turner RENEWLINER – *even if* available as prior art of something – is not anticipatory and, this, cannot support TSS's instant motion.



### III. CONCLUSION

CMS's employees, the named inventors of the '007 Patent, developed the innovation of that patent and put TSS in possession of the innovation for purposes of selling the product. TSS took that knowledge and, after using CMS in making initial disclosures (through at least offers for sale and provision of samples), cast CMS aside in favor of cheaper vendors while asserting, all the while, the novelty and confidentiality of that innovation. TSS now wants to recast these activities as undermining the '007 Patent and its own claims to inventorship and novelty. For all the reasons given, that effort should not be countenanced. Consequently, CMS requests that TSS's Motion for Summary Judgment (Dkt. No. 141) be finally and completely denied.

Dated: March 7, 2024.        **DICKINSON WRIGHT PLLC**

By:/s/ Chris Mitchell

Christopher A. Mitchell. (Admitted *pro hac vice*)
**DICKINSON WRIGHT PLLC**
200 Ottawa Ave NE, Suite 1000
Grand Rapids, MI 49503
Telephone: (616) 336-1058
cmitchell@dickinsonwright.com

John S. Artz (Admitted *pro hac vice*)
**DICKINSON WRIGHT PLLC**
350 S. Main Street, Suite 300
Ann Arbor, MI 48104
Telephone: (248) 205-3264
jsartz@dickinsonwright.com

Mark H. Rogge
**DICKINSON WRIGHT RLLP**
615 National Ave, Suite 220
Mountain View, CA 94043
Telephone: (408) 701-6200
mrogge@dickinsonwright.com

*Attorneys for Plaintiff Cellulose Material Solutions, LLC*



**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of March, 2024, a true and correct copy of this document was served electronically via the Court's CM/ECF system to all attorneys of record.

*Chris A. Mitchell*
Christopher A. Mitchell