RYAN R. SMITH, State Bar No. 229323
rsmith@wsgr.com
CHRISTOPHER D. MAYS, State Bar No. 266510
cmays@wsgr.com
ALEXANDER R. MILLER, State Bar No. 347827
alex.miller@wsgr.com
WILSON SONSINI GOODRICH & ROSATI PC
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: 650.493.9300
Facsimile:  650.565.5100

AVA SHELBY, State Bar No. 312012
ashelby@wsgr.com
WILSON SONSINI GOODRICH & ROSATI PC
953 East Third Street, Suite 100
Los Angeles, CA 90013
Telephone: 323.210.2900
Facsimile: 866.974.7329

Attorneys for Defendant
SC MARKETING GROUP, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CELLULOSE MATERIAL SOLUTIONS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SC MARKETING GROUP, INC.,<br><br>Defendant. | CASE NO.:  3:22-cv-03141-LB<br><br>**DEFENDANT SC MARKETING GROUP, INC.'S REPLY TO MOTION FOR RECONSIDERATION**<br><br>**Judge: Hon. Laurel Beeler**<br>**Date: November 7, 2024**<br>**Time: 9:30 a.m.**<br>**Location: San Francisco Courthouse, Courtroom B – 15th Floor** |

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ..................................................................................................................1

II. ARGUMENT .........................................................................................................................2

    A. CMS Has Not Met Its Burden on Derivation ............................................................2

        1. CMS Fails to Show that TSS Derived Any Ideas from CMS. .....................2

        2. CMS Has Failed to Show that Turner Derived Any Ideas from CMS. ........4

        3. TSS's Joint Inventorship Defense Does Not Contradict this Motion. .........5

    B. CMS Presents Unsupported Speculation About the Juicero Sale ............................6

    C. CMS's Prior Private Disclosures Are Not Public Disclosures ................................7

        1. Private Commercial Activity Is Not a "Public Disclosure". ........................7

        2. Communications Between TSS and CMS Are Not Public Disclosures. .................................................................................................8

        3. *Sanho* Rejected CMS's Confidentiality Agreement Argument. ..................9

        4. CMS's Arguments Re: the Public Use Bar Fail Under *Sanho*..................10

        5. CMS's Prior Website Versions Are Admissible for MSJ Purposes..........11

    D. There Are No Disputed Facts that the Juicero Sale is Prior Art ............................12

    E. CMS Has Not Shown Entitlement To More Discovery .........................................13

III. CONCLUSION ....................................................................................................................14

**TABLE OF AUTHORITIES**

PAGE(S)

**CASES**

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
    800 F.3d 1375 (Fed. Cir. 2015) .................................................................................. 2

*Fraser v. Goodale*,
    342 F.3d 1032 (9th Cir. 2003) .................................................................................. 12

*Illumina Inc. v. Complete Genomics Inc.*, No. C-10-05542 EDL,
    2013 WL 1644829 (N.D. Cal. Mar. 27, 2013) ......................................................... 13

*Lanard Toys Ltd. v. Novelty, Inc.*,
    375 F. App'x 705 (9th Cir. 2010) ............................................................................. 11

*Medicines Co. v. Hospira, Inc.*,
    827 F.3d 1363 (Fed. Cir. 2016) ................................................................................ 12

*Minerva Surgical, Inc. v. Hologic, Inc.*,
    550 F. Supp. 3d 158 (D. Del. 2021) ......................................................................... 11

*Minerva Surgical, Inc. v. Hologic, Inc.*,
    59 F.4th 1371 (Fed. Cir. 2023) ........................................................................... 10, 11

*Pfaff v. Wells Elecs., Inc.*,
    525 U.S. 55 (1998) ................................................................................................... 12

*Qualls v. Blue Cross of California, Inc.*,
    22 F.3d 839 (9th Cir. 1994) ...................................................................................... 13

*S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235 (9th Cir. 1982) ......................................................................... 6

*Sanho Corp. v. Kaijet Tech. Int'l Ltd., Inc*,
    108 F.4th 1376 (Fed. Cir. 2024) ........................................................................ *passim*

*Scaltech, Inc. v. Retec/Tetra, LLC*,
    269 F.3d 1321 (Fed. Cir. 2001) ................................................................................ 12

*STX, LLC v. Brine, Inc.*,
    211 F.3d 588 (Fed. Cir. 2000) .................................................................................. 12

*Tech. Licensing Corp. v. Videotek, Inc.*,
    545 F.3d 1316 (Fed. Cir. 2008) .................................................................................. 2

*United States v. $133,420.00 in U.S. Currency*,
    672 F.3d 629 (9th Cir. 2012) .................................................................................. 6, 7

**STATUTES**

35 U.S.C. § 102 ................................................................................................................*passim*

**RULES**

Fed. R. Civ. P. 37(c) .................................................................................................................. 11

Fed. R. Civ. P. 56(d) .................................................................................................................. 13

Fed. R. Evid. 801(d)(2) .............................................................................................................. 12

Fed. R. Evid. 807(a)(1) .............................................................................................................. 12

I.  INTRODUCTION

CMS's Opposition seeks to disqualify TSS's prior art sale of Renewliner ("2016 Renewliner") based on statutory exceptions for derivation and intervening public disclosures. But CMS repeatedly ignores that it bears the burden of presenting evidence that either of these exceptions apply. First, the undisputed (and corroborated) record shows that TSS contemplated its 2016 Renewliner product no later than June 2016. But CMS has not come forward with evidence of any antecedent disclosure from CMS to TSS to establish derivation under 35 U.S.C. § 102(b)(1)(A) ("Section 102"). Instead, CMS relies only on subsequent disclosures which do not establish CMS as the origin of any subject matter contained in 2016 Renewliner.

Second, CMS also fails to present evidence of any "public disclosure" from CMS prior to the April 2016 sale of 2016 Renewliner establishing that the exception under Section 102(b)(1)(B) applies. CMS undisputedly did not publicize, market, or advertise any product covering its alleged invention before April 2016. Its website makes no reference to any thermoplastic insulation products. Instead, CMS points to a discrete amount of private commercial activity. First, CMS points to a purchase order of its product to TSS's customer Dinner Thyme, which is irrelevant because the product corresponding to that sale was not sent to Dinner Thyme until *after* the 2016 Renewliner's prior art date. Second, CMS points to two private samples (one sent to TSS and the other to TSS's customer Nurture Life) both sent only at the *specific* behest of TSS – despite the fact that *Sanho* explicitly considered and rejected such private submission of samples as a public disclosure.

Thus, CMS fails to show any attempt itself to publicize its alleged invention, fails to explain how the public could know of the patented invention's existence, and points only to private, discrete commercial activity that *Sanho* held is not a "public disclosure" for the purposes of the exception. CMS further ignores *Sanho* by advancing arguments (one regarding confidentiality agreements and another regarding the public use bar) that the Federal Circuit in *Sanho* specifically discussed *and rejected*.

CMS's Opposition also devolves to rank speculation, repeatedly offering mere attorney conjecture to manufacture a dispute of fact. The Court should resist such attempts and instead

TSS REPLY TO MOTION FOR RECONSIDERATION   1   3:22-cv-03141-LB

focus on the evidence, which undeniably shows that CMS's patent is invalid under the on-sale bar of Section 102.

## II.   ARGUMENT

As discussed below, none of CMS's arguments create a genuine dispute of material fact as to the prior art nature of the 2016 Renewliner sale to Juicero. Underlying many of CMS's flawed arguments is its misunderstanding that **CMS**, not TSS, bears the burden of coming forward with evidence that either of the exceptions of Section 102(b) apply:

> [O]nce a challenger (the alleged infringer) has introduced sufficient evidence to put at issue whether there is prior art alleged to anticipate the claims being asserted, prior art that is dated earlier than the apparent effective date of the asserted patent claim, the patentee has the burden of going forward with evidence and argument to the contrary.

*Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1329 (Fed. Cir. 2008); *see also Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1380 (Fed. Cir. 2015) (patentee has burden to "argue or produce evidence" that a reference "is not prior art"). In *Tech. Licensing*, the Federal Circuit explained that the patentee's burden requires it to produce "sufficient evidence and argument" that a given reference "is not prior art." 545 F.3d at 1327. Tellingly, CMS's Opposition nowhere discusses this authority or its burden. Indeed, it fails that burden: rather than produce evidence to support its reliance on Section 102(b)'s exceptions, CMS instead posits rank speculation, base attorney argument, and inapposite case law.

### A.   CMS Has Not Met Its Burden on Derivation

CMS argues that it is entitled to the exception of Section 102(b)(1)(A).[1] None of its arguments have merit.

#### 1.   CMS Fails to Show that TSS Derived Any Ideas from CMS.

First, CMS argues that the April 2016 sale of Renewliner involved "subject matter obtained, at least indirectly, from CMS." Opp. at 7. Not so. To show derivation, CMS bears the

---

[1] CMS's Opposition appears to erroneously refer to Section 102(b)(2)(A). *See* Opp. at 7. That provision, however, applies only to prior art patents. The exception for prior art sales falls under Section 102(b)(1)(A).

burden of producing evidence showing that Turner and TSS "obtained the subject matter disclosed [in 2016 Renewliner] directly or indirectly from the inventor or a joint inventor." 35 U.S.C. § 102(b)(1)(A). CMS has not done this.

CMS has pointed to evidence that, at most (and with all inferences in its favor) shows it conceived of the subject matter contained in the '007 Patent before TSS contributed to that conception.[2] But this is the wrong inquiry: the issue at bar is not who first conceived of the claims of the '007 Patent, but whether CMS has shown evidence of an antecedent disclosure of those ideas to TSS that can form the basis of derivation under Section 102(b)(1)(A).

The undisputed evidence shows that CMS has not met its burden. As the Court has already recognized, by June 2015, TSS was discussing with its film supplier, Timothy Wilson, the idea of an all-PET product with a PET batt and with PET film adhered to both sides. *See* Dkt. 189-33 ¶¶ 2-3; Dkt. 189-6 at 33:8-18; Dkt. 236 at 5-6. CMS offers no evidence showing that it conveyed to TSS any portion of the ideas for that product before June 2015 or before TSS's discussions with Mr. Wilson. At most, CMS's President stated that his employee Chris Benner "allud[ed] to" CMS's development of such a product in a June 2015 email, but that email makes no reference to an all-PET product or even a product with PET film, let alone adhering such film to both sides of a PET fibrous batt:

> As a final option, if CMS were able to produce a proprietary, insulative material just for TSS that was dust-free, easily recyclable in standard recycling systems, dark grey in color, and contained at least the same 85% recycled content as the Denim insulation, would Hello Fresh consider it? If so, by eliminating all the added costs of poly-coated paper facings, labor to wrap, etc... What material $/sqft target + die-cutting cost ($0.26/ea flat-bed or $0.15/ea rotary die cutter) you could work with to win this business from Bonded Logic? I was estimating somewhere in the $0.43+/sqft range…
>
> Did I mention this new material is highly compressible (similar to urethane foam) and could also be a cost-effective solution to those for your Kangaroo mailers you asked me to look at? When you get a few minutes, I would like to personally discuss this exciting material option with you? Thanks!

Dkt. 141-3. On the contrary, as shown above that communication conveyed only generic ideas of a product that was "easily recyclable," "contained at least the same 85% recycled content" as a

---

[2] Of course, TSS disputes CMS's prior conception theory and TSS maintains that it conceived of critical aspects of the claimed invention.

separate **denim** product, was "highly compressible," and was "similar to urethane foam."  *Id.* If anything, the idea conveyed in Mr. Benner's email underscores a different idea for a product that was only "85% recycled content" and not 100% PET.  The initial samples of a thermoplastic insulation product that CMS sent to TSS later in the Summer of 2015 undeniably occurred well after TSS had begun internally discussing its all-PET idea.  Those samples also contained no film.  Neither the June email from Mr. Benner nor the later samples show a transfer of ideas from CMS to TSS *before* TSS's discussion of its idea with Tim Wilson.

CMS's argument that it eventually disclosed the subject matter of the '007 Patent to TSS before the April 2016 Turner Sale is immaterial for similar reasons.  If TSS already possessed the relevant ideas before CMS's disclosure, then the ideas nevertheless belong to TSS and did not derive from CMS or its inventors.  CMS bore the burden to producing evidence that it is the origin of the ideas contained in the 2016 Renewliner.  By failing this burden, CMS cannot show derivation under Section 102(b)(1)(A).

### 2.     CMS Has Failed to Show that Turner Derived Any Ideas from CMS.

CMS next argues that Turner "didn't come up with the Renewliner product."  Opp. at 8.  This argument is also immaterial.  The question is whether Turner derived (directly or indirectly) the ideas for the 2016 Renewliner product from CMS.  Once again, CMS has failed to come forward with any evidence of this.

To begin with, CMS fails to address the fact that Turner itself had the idea for thermoplastic fibrous batt insulation since at least 1998.  *Compare* Dkt. 221-7 at 12:22-13:23 *with* Dkt. 236 at 7 ("Mr. Henderson also said in his deposition that before 2015, Cellulose had not adhered PET film to a fibrous batt, let alone a two-sided fibrous batt.").  CMS has not come forward with a single fact—let alone evidence sufficient to carry its burden—disputing Turner's preexisting knowledge of this part of the ultimate 2016 Renewliner product.  Thus, there is no evidence showing that Turner derived the subject matter of a thermoplastic fibrous batt from CMS directly or indirectly.

The only remaining component of the 2016 Renewliner product not already in Turner's pre-existing possession was the idea of applying PET film to both sides of the insulation.  CMS

argues that TSS conveyed this idea to Turner. But this argument is ***irrelevant*** since, as discussed above, CMS has not shown that TSS derived that particular idea from CMS.

In any event, none of the evidence to which CMS points shows TSS conveying original ideas to Turner for adhering a film to both sides. CMS points to TSS's agreement with Turner but ignores the fact that the agreement "didn't provide any specifications." *See* Dkt. 221-7 at 22:3-8 (Turner Dep. Tr.). CMS also discusses a generic "spec[ification]," but as Mr. Turner testified, that specification refers to the size of the polyester fibers and the percentage of binding fibers in the batt—not the idea of adhering film to both sides of a thermoplastic fibrous batt. *See id.* at 31:17-32:19. CMS did not ask (and has presented no evidence showing) how Turner originally obtained that idea, since Mr. Turner himself did not remember the source of the specification. *See id.* at 23:12-24:11, 31:17-33:1. The testimony to which CMS points merely relates to manufacturing a specific product, not the source of the ideas behind that product. For example, CMS fails to show that Turner did not manufacture similar products for others before working with TSS. Without making such a showing, CMS cannot meet its burden even to show from whom Turner originally derived its ideas.

CMS also argues that "the Juicero Purchase Order . . . reads much like the earlier DinnerThyme Purchase Order." Opp. at 11. This argument is facile. ***Of course*** the purchase orders look similar: they are both TSS purchase orders to its respective manufacturing vendors at the time.[3] In any event, CMS's argument is completely immaterial – any similarity in the appearances of the purchase orders aside, CMS has failed to show TSS derived its ideas from CMS.

### 3.   TSS's Joint Inventorship Defense Does Not Contradict this Motion.

CMS argues that the existence of the joint inventorship dispute renders TSS's motion "disingenuous" because "[w]hatever the ultimate outcome . . . the 'offer for sale' allegedly

---

[3] CMS is incorrect that the "Juicero Purchase Order reiterates materially the same specifications" (*id.*) – a quick comparison of the two purchase orders shows that different item numbers are used, include different descriptions, different sizes, and different quantities. *Compare* Dkt. 149-2, Ex. C *with* Dkt. 148-8.

| TSS REPLY TO MOTION FOR RECONSIDERATION | 5 | 3:22-cv-03141-LB |

embodied in the Juicero Purchase Order would be a disclosure of RENEWLINER made directly by (alleged) joint inventor (Sal Cardinale) or indirectly by someone (TSS) who obtained the disclosed subject matter from CMS (employer of the named inventors of the '007 Patent) and/or alleged joint inventor Sal Cardinale." Opp. at 13. CMS's logic is, again, flawed. As the Court is aware, TSS's inventorship claim depends in relevant part on whether CMS's Chris Benner had independently conceived of the idea of adhering thermoplastic film to both sides of a thermoplastic fibrous batt *before* TSS communicated that idea to CMS. *See generally* Dkt. 236 at 6-7; *id.* at 16 ("And conveying to Cellulose what was already known would not be an inventive concept."). This is an entirely *different* question from whether TSS derived a concept from CMS. TSS can have independently developed its idea without derivation regardless of whether Mr. Cardinale is a joint inventor. What's more, while TSS bears the burden of proving joint inventorship at trial, here, it is CMS that bears the burden of coming forward with evidence that TSS derived its idea for an all-PET product with PET film on both sides from CMS. And, while CMS argues that the existence of TSS's joint inventorship claim is inconsistent with the current motion, that would only be the case if CMS conceded the issue of joint inventorship—which it does not. Having taken the position in this litigation that Mr. Cardinale is not a joint inventor of the '007 Patent, CMS cannot avoid invalidation of its patent by taking a contradictory position now.

### B.  CMS Presents Unsupported Speculation About the Juicero Sale

CMS next bizarrely argues that the April 2016 Turner Sale somehow may not have involved Turner's product at all. Instead, CMS speculates, "TSS may have offered Juicero product based on samples obtained from CMS." Opp. at 14. Belying the utmost desperation of this position, TSS offers **zero** evidence for the existence of such CMS-sourced samples or that TSS provided them to Juicero. CMS does not, for example, point to any emails or communications discussing the provision of such samples to Juicero. CMS's rank speculation cannot be credited. *See S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982) ("a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda."); *see also United States v. $133,420.00 in*

*U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) ("a plaintiff cannot rely on mere allegations but rather must 'set forth' by affidavit or other evidence 'specific facts'").  In any event, CMS ignores that TSS's technical expert analyzed the 2016 Renewliner product *from Turner* and verified that the product was materially identical to the current version of Renewliner.  *See* Dkt. 141-7 ¶¶ 8-12.

### C. CMS's Prior Private Disclosures Are Not Public Disclosures

CMS next argues that it is entitled to the exception of Section 102(b)(1)(B)[4] because it contends that it publicly disclosed the subject matter of its patent.  None of this is correct.

#### 1. Private Commercial Activity Is Not a "Public Disclosure".

First, CMS argues that it publicly disclosed the subject matter of its invention.  CMS points to (1) a private sale of its product to TSS's customer Dinner Thyme; (2) a sample privately provided to TSS at TSS's request; and (3) a sample provided, at TSS's request, to TSS's customer Munchery.  As discussed in TSS's motion, however, the fact that CMS made one private sale (Dinner Thyme) and sent discrete samples to TSS and Munchery do not show that the claimed subject matter was broadly "publicly available."

First, the Dinner Thyme purchase order date of February 2016 is completely irrelevant to the issue of a public disclosure for two reasons.  First, the private transaction is not a public disclosure under *Sanho*.  Second, what matters (if anything) is *when* the product was sent to Dinner Thyme because it is the product that is alleged to be the disclosure, not the purchase order.  CMS does not dispute that the product was not sent to Dinner Thyme until after 2016 Renewliner's prior art date.  *See* Dkt. 238 at 10; Dkt. 148-8 (Turner invoice showing "received in full" date of April 22, 2016); Dkt. 141-6 (Dinner Thyme invoice # 12964) and Dkt. 173-9 (CMS's Chris Benner discussing anticipated shipment date of April 27, 2016, for invoice # 12964).  CMS's argument regarding a purchase order again conflates the standards for the "on sale bar" with the standards for the "public disclosure exception" – which *Sanho* expressly rejected.  *See Sanho*, 108 F.4th at 1379 ("There is also nothing in the record to indicate that the order for 15,000 HyperDrives was fulfilled before Kuo's effective filing date, or what became of those devices.").

---

[4] Again, CMS erroneously cites to Section 102(b)(2)(B) in its Opposition.

Second, the private submission of two samples (one to TSS and the other to Nurture Life) does not show any public disclosure. CMS only sent these samples when prompted to by TSS; the samples were not generally available to the public, CMS did not market or advertise the product on its website, and there is no evidence that any segment of industry at large knew of the product's existence. *See* Dkt. 238-1 (Mays Decl.) ¶¶ 3-5 and Dkts. 238-3-238-5 (Exs. 2-4). Indeed, *Sanho* expressly involved the private submission of samples and ultimately held that such activity—even when coupled with a later sale of the product—did not rise to the level of a public disclosure. *See Sanho*, 108 F.4th at 1379 ("After obtaining a HyperDrive sample, Sanho placed an order for 15,000 HyperDrive units").

Thus, CMS has not come forward with evidence showing that its product was generally disclosed to the public or even the industry in which it operates. Tellingly, CMS points to no commercial activity of its own beyond private transactions and communications with TSS, who only knew about the product because it helped CMS develop it.

**2.    Communications Between TSS and CMS Are Not Public Disclosures.**

Instead, CMS argues that in addition to the foregoing, it "was supporting TSS's efforts to solicit third party customers for the CMS Product." Opp. at 15. CMS also selectively quotes a smokescreen of excerpted communications between TSS and CMS. However, cutting through the haze, the communications are deficient in two critical ways. <u>*First*</u>, there is no showing of any product sent to anyone (other than the two samples discussed above) prior to the 2016 Renewliner's April 2016 prior art date. As noted above, the Dinner Thyme transaction did not involve a product disclosure until after the 2016 Renewliner prior art date. Similarly, the other communications to which CMS points do not reflect anything beyond private discussions between TSS and CMS regarding potential pricing – not the actual sending of product. The <u>*second*</u> critical deficiency is the lack of any communication with anyone other than TSS. That TSS knew of the product is unsurprising since it helped develop it. But where is CMS's evidence showing it discussed this product with anyone outside of TSS? Where is the sales activity to involving the public? There is none, and these communications only reinforce the ***private*** nature of the commercial activity at

play. *See, e.g.,* Dkt. 224-8 at Exs. A-D. There was no disclosure to the public at large and *Sanho* explained that the public disclosure exception was not intended to protect disclosures made in a private commercial setting. *See Sanho Corp. v. Kaijet Tech. Int'l Ltd., Inc*, 108 F.4th 1376, 1385 (Fed. Cir. 2024) ("The testimony establishes only that there was a private sale between two individuals arranged via private messages. There is no indication the sale disclosed the inventive subject matter to the public sufficiently for the exception to prior art in section 102(b)(2)(B) to apply."). As such, CMS has failed to meet its burden of coming forward with evidence sufficient to show a public disclosure of its invention.

CMS argues that its claimed invention is of "self-evident construction" based solely on product samples—thus, the provision of such samples qualifies as a "public disclosure." Opp. at 17. But the degree to which CMS's invention is "self-evident" is not the point. CMS misplaces its focus on the nature of the product rather than the private nature of the activity involved. In any event, CMS's own expert belies the argument, as he engaged in extensive laboratory testing to render his opinions as to whether the product satisfies the claim limitations. *See* Dkt. 219-6 ¶¶ 82-88, 92-97, 105-119, 129-138.

### 3. *Sanho* Rejected CMS's Confidentiality Agreement Argument.

Next, CMS argues that "there were no confidentiality agreements or expectations of confidentiality respecting these disclosures" and argues that absent these confidentiality agreements, the private sale to Dinner Thyme and samples sent to TSS and NurtureLife "constitute prior public disclosures." Opp. at 16-17. This existence or absence of a confidentiality agreement is totally irrelevant. Indeed, in *Sanho* the Federal Circuit explicitly noted that there was no confidentiality agreement, but nevertheless found no public disclosure. *See Sanho*, 108 F.4th at 1385 (holding there was no public disclosure and noting "there was no confidentiality or nondisclosure agreement"). Thus, CMS is simply incorrect that the presence or absence of confidentiality agreements controls the applicability of the public disclosure exception.

### 4. CMS's Arguments Re: the Public Use Bar Fail Under *Sanho*.

Hoping to push the boundaries of the public disclosure exception, CMS directs the Court to the Federal Circuit's decision in *Minerva Surgical, Inc. v. Hologic, Inc.*, 59 F.4th 1371 (Fed. Cir. 2023).[5] But *Minerva* is both inapposite and highly distinguishable.

First, *Minerva* involved patents invalidated under the "public use bar" of pre-AIA Section 102 (which does not include the exceptions of the current Section 102(b)). *See id.* at 1373 ("the district court granted summary judgment that the asserted claims are anticipated under the public use bar of pre-AIA 35 U.S.C. § 102(b)."). CMS's attempts to use that public use bar once again run squarely afoul of *Sanho*, which again specifically considered and rejected this approach. *See Sanho,* 108 F.4th at 1383–84 (Fed. Cir. 2024) (lengthy discussion of public use bar and stating "Our cases also do not remotely suggest that the reasons for an expansive view of what constitutes commercial 'public use' would apply with equal force to the exception from prior art for subject matter "publicly disclosed" in section 102(b)(2)(B). Indeed, our cases suggest the opposite.").

Second, *Minerva* the activity described in Minerva was significantly more "public" than the private commercial activity at issue here. That activity described involved:

- showcasing the prior art medical device at an industry conference open to the public that was considered the "Super Bowl" of the industry attended by "various industry groups, competitors, investors, and physicians";
- displaying fifteen "fully functional" devices at its booth;
- soliciting feedback on the device from attendees of the conference;
- distributing brochures to attendees of the conference that gave detailed descriptions of the device;
- demonstrations to the public involving using the device to show how it operated; and
- sponsoring a technical presentation at the conference highlighting the functionality and advantages of the device.

---

[5] For the purposes of full disclosure, the undersigned was counsel of record in *Minerva*.

*Minerva*, 59 F.4th at 1376-1378; *see also Minerva Surgical, Inc. v. Hologic, Inc.*, 550 F. Supp. 3d 158, 165-166 (D. Del. 2021) (further detailing the relevant conference).  Thus, even if the Court were to consider the level of "public" activity in *Minerva* as a benchmark for the "public disclosure" exception, the facts of that case are strikingly difference from the discrete private commercial activity to which CMS now points.  If anything, *Minerva* disproves CMS's point.

*   *   *   *

At base, CMS fails to account that it has pointed only to a discrete amount of private commercial activity prompted exclusively by TSS.  CMS fails to answer the fundamental question: How would a member of the public have known that this product existed?  Because it cannot do so, it has not shown that the public disclosure exception applies.

### 5. CMS's Prior Website Versions Are Admissible for MSJ Purposes.

CMS argues that the Court should disregard the archived versions of its website included with TSS's Motion.  Tellingly, CMS does not deny the substance of what this evidence shows: that CMS never advertised or marketed the claimed invention (or made it generally available for purchase by the public) during the relevant period.  Instead, CMS argues that the Court should disregard it as either untimely or inadmissible.  Neither point holds water.

First, the archived website belongs to CMS and, therefore, has always been in its possession.  There was, therefore, no "failure to disclose" under Fed. R. Civ. P. 37(c).  Even so, however, CMS has made no attempt to show that the evidence should be excluded under the Ninth Circuit's standards for doing so.  *See Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010) ("Among the factors that may properly guide a district court in determining whether a violation of a discovery deadline is justified or harmless are: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence.").  CMS has not shown any prejudice or surprise in having its own website referenced, nor has it argued any potential disruption of the trial or bad faith by TSS.

1    Second, even though the Court should consider admissible evidence, "[a]t the summary
2 judgment stage, [courts] do not focus on the admissibility of the evidence's form. [They] instead
3 focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir.
4 2003). Here, CMS's website is a statement by a party opponent and is not hearsay; nor is it
5 challenged by CMS as being erroneous or lacking trustworthiness. *See* Fed. R. Evid. 801(d)(2),
6 807(a)(1). Its contents are admissible statements at this stage when used against CMS.

### D. There Are No Disputed Facts that the Juicero Sale is Prior Art

CMS next presents another specious argument that the Juicero purchase order is not a commercial offer for sale "to third party Juicero." CMS's only argument in support of this position is that the price terms are to be paid to Turner. CMS does not dispute that the purchase order is an offer for sale, however addressed. CMS also does not dispute that the purchase order includes a specific quantity, a specific price, shipment provisions, and payment terms. It offers no authority why a commercial offer for sale must be to a "third party," and even if it did, it fails to explain how the purchase order (which is clearly between TSS and Turner for a product to be delivered to Juicero) does not involve "third parties." Indeed, the purchase order is sufficient to show that the product described therein was "on sale" for the purpose of rendering it prior art under Section 102(a)(1). *See* Dkt. 238 at 6-7 (discussing Section 102(a)(1)); Dkt. 160 at 5 (quoting *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1372 (Fed. Cir. 2016)); *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1328 (Fed. Cir. 2001)). CMS also does not dispute that the purchase order was accepted, as shown by the stamp "RECEIVED IN FULL." Dkt. 148-8; *see Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998) ("the acceptance of [a] purchase order prior to [the critical date] makes it clear that such an offer had been made, and there is no question that the sale was commercial rather than experimental in character."). CMS appears to maintain its challenge to the delivery timing of the product at issue in the purchase order; however, as previously discussed delivery is immaterial to whether a product is "on sale" for the purposes of Section 102(a)(1). *See STX, LLC v. Brine, Inc.*, 211 F.3d 588, 590, (Fed. Cir. 2000) ("The fact that delivery was set for dates after the critical date is irrelevant to the finding of a commercial offer to sell.")

### E. CMS Has Not Shown Entitlement To More Discovery

CMS finally argues that fact discovery should be reopened based on *Sanho's* new interpretation of "publicly disclosed." But CMS fails to explain why it could not have diligently pursued any such discovery during the fact discovery period. TSS served its original Invalidity Contentions nearly two years ago on December 5, 2022. *See* Dkt. 63-4. Those contentions alleged that the '007 Patent was invalid for the on-sale bar based on sales that TSS made of Renewliner in 2016. *See id.* at 4 ("TSS offered for sale and sold the accused Renewliner product by at least January 6, 2016."). Thus, CMS was fully on notice of this defense during the fact discovery period and could have pursued discovery on this.

Indeed, CMS engaged in extensive discovery into the development history of TSS's product, including discovery both of TSS, TSS's film supplier Timothy Wilson, and TSS's manufacturer Turner. CMS specifically deposed Turner on the substance of the Juicero purchase order that is now the subject of this motion. *See* Dkt. 221-7 at 43:18-46:3. Despite this extensive discovery, CMS blithely requests that fact discovery be reopened, premised only on vague and ambiguous assertions.

This is simply a stall tactic; CMS does not (and cannot) identify what facts it cannot present that are "essential to justify its opposition." Fed. R. Civ. P. 56(d); *see also* Dkt. 245-1 ¶ 4. Nor does CMS explain why it could not have pursued such facts before the close of the discovery period. *See Qualls v. Blue Cross of California, Inc.*, 22 F.3d 839, 844 (9th Cir. 1994) (decision not to award additional discovery only error if the movant "diligently pursued its previous discovery opportunities, and if the movant can show how allowing additional discovery would have precluded summary judgment."); *Illumina Inc. v. Complete Genomics Inc.*, No. C-10-05542 EDL, 2013 WL 1644829, at *1 (N.D. Cal. Mar. 27, 2013) ("The party opposing summary judgment must show that it has been diligent in its pursuit of discovery and that the information it seeks would, if discovered, preclude summary judgment."). For these reasons, the Court should not reopen fact discovery at this time.

## III. CONCLUSION

TSS began selling its Renewliner Product in April 2016, before the priority date of the '007 Patent. CMS has not met its burden of presenting evidence that the product was derived from CMS. Likewise, that CMS privately made an isolated sale of its product and privately sent a sample of it to TSS and TSS's customer Nurture Life is not a public disclosure of its invention. Thus, the April 2016 Renewliner is invalidating prior art for which neither exception of Section 102(b) applies.

Dated: October 18, 2024                           WILSON SONSINI GOODRICH & ROSATI
                                                  Professional Corporation


                                                  By: /s/ Christopher D. Mays
                                                      Ryan R. Smith
                                                      Christopher D. Mays

                                                  Attorneys for Defendant
                                                  SC MARKETING GROUP, INC.